1998 OK 49

**STATE of Oklahoma ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,**

v.

**Michael T. BRASWELL, Respondent.**

**No. SCBD 4117.**

Supreme Court of Oklahoma.

June 9, 1998.

Rehearing Denied Sept. 8, 1998.

Mike Speegle, Assistant General Counsel, Oklahoma Bar Ass'n, Oklahoma City, for Complainant.

Frederick W. Southern, Oklahoma City, for Respondent.

OPALA, Justice.

¶1 In this disciplinary proceeding against a lawyer, the issues to be decided are, (1) Does the record submitted for our examination provide sufficient evidence for a meaningful *de novo* consideration of the complaint's disposition?[1] and (2) Is disbarment with imposition of costs an appropriate disciplinary sanction for respondent's breach of professional ethics? We answer both questions in the affirmative.

---

1. The record consists of the transcript of the hearing held before the Professional Responsibility Tribunal, exhibits offered by both parties, which were admitted in evidence at that hearing, and the Report of the Professional Responsibility Tribunal. The parties submitted no fact stipulations.

¶2 The Oklahoma Bar Association (the "Bar") charged Michael T. Braswell ("Braswell" or "respondent"), a licensed lawyer, with four counts of professional misconduct. After a hearing, a trial panel of the Professional Responsibility Tribunal (the "trial panel" and the "PRT," respectively) issued a report containing its findings of fact and conclusions of law together with a recommendation of discipline. The PRT found that respondent had violated numerous provisions of the Oklahoma Rules of Professional Conduct (the "ORPC")[2] and of the Rules Governing Disciplinary Proceedings (the "RGDP").[3] It recommended that Braswell be *disbarred* and required to pay the costs of this proceeding. Braswell denies there is clear and convincing evidence that he has violated any rules of the ORPC or RGDP and denies that his conduct warrants sanctions of any kind.

# I

## INTRODUCTION TO THE RECORD IN THIS DISCIPLINARY PROCEEDING

¶3 This bar disciplinary proceeding was commenced on October 18, 1995, by the filing of the Bar's formal complaint in accordance with the provisions of RGDP Rule 6.[4] The complaint contains four counts, each organized around allegations of Braswell's professional misconduct toward an individual grievant, and each alleging multiple violations of the ORPC or its predecessor, the Code of Professional Responsibility,[5] and of the RGDP. The hearing on the formal complaint began on January 17, 1996, and took three days of testimony over a period of seven months.[6]

¶4 Our decision in this case has required the careful examination of a voluminous record of proceedings, in which respondent vigorously contested every charge of wrongdoing. The transcript of the formal PRT hearing alone contains over six hundred pages of testimony and in excess of eighty exhibits.[7]

¶5 Upon the conclusion of the formal hearing, the trial panel found *clear and convincing evidence* with respect to each of the four counts charging that respondent had engaged in numerous acts of unprofessional conduct.[8] As set forth below, we accede to many, but not all, of the PRT's findings of fact and conclusions of law. Despite having to reject some of the Bar's complaint allegations, we nevertheless adopt the PRT's recommendation of discipline. The seriousness of the violations and the respondent's unwillingness to acknowledge any wrongdoing or to

**2.** 5 O.S.1991, Ch. 1, App. 3–A.

**3.** 5 O.S.1991, Ch.1, App. 1–A.

**4.** *Id.* at Rule 6.1.

**5.** 5 O.S.1981, Ch.1, App. 3. The Code of Professional Responsibility was superceded by the ORPC effective as of July 1, 1988.

**6.** The second day of testimony took place on August 22, 1996, and the third day on August 23, 1996. The reason for the seven-month delay is not entirely set forth in the record, but appears at least in part to be attributable to respondent's medical problems.

**7.** The exhibits include six transcripts. Three of these are depositions taken by the Bar in the original investigation of several of the counts included in the complaint. The first deposition was taken on December 8, 1994, and concerned the grievance filed by Ms. Louis Bowen. The second deposition was taken on April 12, 1995, and concerned the grievances filed by Ms. Bowen, Judge David L. Russell, and William H. Dixon. The third deposition hearing took place after the filing of the formal complaint, on December 19, 1995, and concerned only the grievance filed by Mr. Dixon. The remaining three transcripts included among the exhibits are of various depositions taken, or hearings conducted, in connection with cases involved in the grievances.

**8.** Rule 6.12(c), *Rules Governing Disciplinary Proceedings, supra,* note 3, provides:

"To warrant a finding against the respondent in a contested case, the charge or charges must be established by clear and convincing evidence, and at least two of the members of the Trial Panel must concur in the findings."

Before this court will impose discipline upon a lawyer, clear and convincing evidence must be presented that the lawyer has committed the violations alleged. *State ex rel. Okl. Bar Ass'n v. Kessler,* 1995 OK 32, ¶23, 895 P.2d 713, 718; *State ex rel. Okla. Bar Ass'n v. Downing,* 1993 OK 44, ¶11, 863 P.2d 1111, 1112; *State ex rel. Okla. Bar Ass'n v. Colston,* 1989 OK 74, ¶14, 777 P.2d 920, 923.

cooperate in the investigation of these grievances warrant his disbarment.

## II

### THE RECORD BEFORE THIS COURT PROVIDES SUFFICIENT EVIDENCE FOR A MEANINGFUL *DE NOVO* CONSIDERATION OF ALL FACTS RELEVANT TO THIS PROCEEDING

■■■ ¶ 6 In a bar disciplinary proceeding this court functions in the role of adjudicative licensing authority exercising exclusive original jurisdiction.[9] This jurisdiction rests on the court's constitutionally vested, nondelegable power to regulate the practice of law, including the licensure, ethics, and discipline of legal practitioners in this state.[10] In deciding whether discipline is warranted and what sanction, if any, is to be imposed for the misconduct alleged, this court conducts a full-scale, nondeferential, *de novo* examination of all relevant facts,[11] in which the recommendations of the trial panel are neither binding nor persuasive.[12] We are not guided by the scope-of-review rules applicable in the context of corrective relief on appeal or certiorari, in which context we must leave undisturbed another tribunal's findings of fact.[13]

■■■ ¶ 7 The court's duty can only be discharged if the trial panel submits to us a complete record of the proceedings.[14] Our initial task is to ascertain whether the tendered record is sufficient to permit (a) an independent determination of the facts and (b) the crafting of appropriate discipline. The latter is that which (1) is consistent with the discipline imposed upon other lawyers who have committed similar acts of professional misconduct and (2) avoids the vice of visiting disparate treatment on the respondent-lawyer.[15]

9. *State ex rel. Okl. Bar Ass'n v. Leigh*, 1996 OK 37, ¶ 11, 914 P.2d 661, 666; *State ex rel. Okl. Bar Ass'n v. Eakin*, 1995 OK 106, ¶ 8, 914 P.2d 644, 647; *State ex rel. Okl. Bar Ass'n v. Bolton*, 1994 OK 53, ¶ 15, 880 P.2d 339, 344; *State ex rel. Okl. Bar Ass'n v. Donnelly*, 1992 OK 164, ¶ 11, 848 P.2d 543, 545; *State ex rel. Okl. Bar Ass'n v. Raskin*, 1982 OK 39, ¶ 11, 642 P.2d 262, 265; *In re Integration of State Bar of Oklahoma*, 185 Okl. 505, 95 P.2d 113, 115 (1939).

10. *Eakin, supra*, note 9 at ¶ 8, at 648; *State ex rel. Okl. Bar Ass'n v. Downing*, 1990 OK 102, ¶ 12, 804 P.2d 1120, 1122–1123; *Raskin, supra*, note 9 at ¶ 11, at 265–266.

11. *Leigh, supra*, note 9 at ¶ 11, at 666; *Eakin, supra*, note 9 at ¶ 8, at 647–648; *State ex rel. Okl. Bar Ass'n v. Lloyd*, 1990 OK 14, ¶ 8, 787 P.2d 855, 858; *State ex rel. Okl. Bar Ass'n v. Stubblefield*, 1988 OK 141, ¶ 7, 766 P.2d 979, 982; *State ex rel. Okl. Bar Ass'n v. Cantrell*, 1987 OK 17, ¶ 1, 734 P.2d 1292, 1293; *State ex rel. Okl. Bar Ass'n v. Foster*, 1969 OK 23, ¶ ——, 454 P.2d 654, 656; *State ex rel. Okl. Bar Ass'n v. Brandon*, 1969 OK 28, ¶ 5, 450 P.2d 824, 827. Because this court's cognizance of disciplinary proceedings cannot be shared with any other institution, every aspect of the Bar's adjudicative process must be supervised by our *de novo* consideration. This attribute of nondelegable jurisdiction serves to distinguish the conduct of bar disciplinary functions from trial *de novo*—a retrial in a different court— or even from *de novo* appellate review on the record, which stands for an independent, nondeferential examination *of another tribunal's record.*

12. *Eakin, supra*, note 9 at ¶ 8, at 648; *Raskin, supra*, note 9 at ¶ 11, at 265. The court's range of options in a disciplinary proceeding is set forth in Rule 6.15(a), RGDP, 5 O.S.1991, Ch. 1, App. 1–A:

> "The Supreme Court may approve the Trial Panel's findings of fact or make its own independent findings, impose discipline, dismiss the proceedings or take such other action as it deems appropriate."

13. *Bolton, supra*, note 9 at ¶ 15, at 344; *Eakin, supra*, note 9 at ¶ 8, at 648; *State ex rel. Okl. Bar Ass'n v. Farrant*, 1994 OK 13, ¶ 7, 867 P.2d 1279, 1284; *Levi v. Mississippi State Bar*, 436 So.2d 781, 782 (Miss.1983).

14. *RGDP, supra*, note 3, Rule 6.13. Rule 6.13 provides in part:

> "Within thirty (30) days after the conclusion of the hearing, the Trial Panel shall file with the Clerk of the Supreme Court a written report which shall contain the Trial Panel's findings of fact on all pertinent issues and conclusions of law (including a recommendation as to discipline, if such is found to be indicated, and a recommendation as to whether the costs of the investigation, record and proceedings should be imposed on the respondent), and shall be accompanied by all pleadings, a transcript of the proceeding, and all exhibits offered thereat...."

15. *Eakin supra*, note 9 at ¶ 9, at 648; *Bolton, supra*, note 9 at ¶ 16, at 345; *State ex rel. Okl. Bar Ass'n v. Perceful*, 1990 OK 72, ¶ 5, 796 P.2d 627, 630.

¶ 8 We have carefully scrutinized the extensive record submitted to us in this proceeding and conclude that it is adequate for our *de novo* consideration of respondent's alleged professional misconduct.

### III

### COUNT ONE

 ¶ 9 *Count One* of the complaint arises from a grievance filed by Judge David L. Russell of the United States District Court for the Western District of Oklahoma. On September 22, 1989, Judge Russell entered an order requiring respondent and another attorney to pay sanctions for filing a frivolous lawsuit. This order was affirmed by the United States Court of Appeals for the Tenth Circuit on April 23, 1990. The case was remanded to the district court for the imposition of an attorney's fee related to the appeal. Prior to the events resulting in the filing of this grievance by Judge Russell, neither the amount of imposed sanctions nor the appeal-related attorney's fee was paid by Braswell.

¶ 10 On April 28, 1994, approximately four and one-half years after the issuance of the sanctions order, the attorneys for the parties to whom the sanctions were owed held a hearing on Braswell's assets, in which Braswell testified that (1) he had "never had any income from the practice of law," [16] (2) he had not told anyone since 1991 that he had earned any income from the practice of law,[17] (3) he had not prepared or presented any financial statements of any nature to any third party since January 1, 1990,[18] and (4) he had owned some real estate in the 1980's, but it had been seized by the Internal Revenue Service in 1988 or 1990,[19] then returned

to him, and thereafter seized by the county in 1989 or 1990.[20] He refused to answer any questions about his wife's or his professional corporation's income.[21]

¶ 11 When Braswell still had not paid the sanctions by August, 1994, Judge Russell held a hearing to determine whether Braswell should be held in contempt for failure to comply with the sanctions order and for failure to pay the appeal-related counsel-fee award.

¶ 12 The attorneys for the parties to whom the sanctions were owed had by this time obtained through subpoena two financial documents which Braswell had submitted to Lincoln National Bank in Oklahoma City. The first document was a "confidential financial statement for individual only" signed by Michael T. Braswell dated June 30, 1992, showing assets of $325,000 in real estate and $750,000 in "other personal assets." The second document was a personal loan application signed by Michael Braswell dated February 9, 1994, just two months before the hearing on assets, stating that Braswell had been engaged as an attorney for eighteen years, and that his monthly income was $5,700, $2,700 of which was disability income and $3,000 of which came from "Law Practice."

¶ 13 At the contempt hearing before Judge Russell, Braswell was questioned about his income and assets without first being told that his two financial documents from Lincoln National Bank were in hand. Again Braswell testified that he was a practicing lawyer, but that he received no compensation for his work.[22] Again he denied ever telling anyone since the sanctions order was entered in 1989 that he had made any

---

16. Transcript, *Holmes v. First Security Bank & Trust Company*, Case No. CIV–89–94–R, Hearing on Assets of Michael T. Braswell, at 9, 34, 38–39, and 58.

17. *Id.* at 9.

18. *Id.* at 23 and 27.

19. *Id.* at 36.

20. *Id.* at 37.

21. *Id.* at 4, 7.

22. Transcript, *Holmes v. First Security Bank & Trust Company*, Case No. CIV–89–94–R, Hearing Before the Honorable David L. Russell, United States District Judge, August 25, 1994, at 16, 19–20:

"Q....Have you made any money practicing law since this order was entered September 22, 1989?
A. No.
Q. Not a dime?
A. Not one penny."

money practising law.[23] Asked whether he had represented to his bank since the inception of the sanctions order that he had a net worth of over $900,000, he testified that he did not think so.[24]

¶ 14 When confronted with the personal loan application, Braswell explained that he had not disclosed its existence because, despite its name, it was not an application for a personal loan, but rather an application to obtain a loan for Braswell and Associates, Inc., the professional corporation through which he practiced law. Therefore, since it did not apply to him personally, he was not required to disclose it in response to questions about his personal income and assets.[25] He explained that his only personal connection to the loan application was as guarantor of the loan.[26] Furthermore, he testified that he had provided the $3,000 figure to the bank only in response to the bank's request for information on his wife's income and that someone other than himself had filled in the information improperly identifying the $3,000 as his income rather than his wife's.[27] Thus, he claimed he never represented to the bank that he personally had any income from the law firm despite what the document purports to say.

¶ 15 As for his wife's income, respondent testified that even though he had given the bank that figure, his wife was not actually earning $3,000 per month at that time because the law firm was not making a sufficient amount of money to pay her.[28] Rather, he testified, the $3,000 per month was "the amount that would have been paid to her each month if we were able to pay, ..."[29]

¶ 16 Judge Russell noted that between Braswell's $2700 per month disability income and the $27,000 per year that his tax returns showed his wife earned, Braswell's family income was over $54,000 per year. Despite what appeared to be a simple arithmetic calculation, Braswell denied that he had that amount of family income:

"THE COURT: But at least between the two of you, you and your wife, you have at least family income a year of over 50,000 a year; would that be right?

MR. BRASWELL: That is not correct, Your Honor, because this year [1994], for instance, she has not received a check, because no funds—not enough funds have been coming in.... So as of this year, she has not received any *payroll* checks...."[30] (emphasis added)

¶ 17 The existence of the "confidential financial statement for individual only" also contradicted Braswell's testimony at the hearing on assets that he had not prepared or presented any financial statements subsequent to the date of the sanctions order. Braswell explained that he had simply forgotten about the document because he had long since lost all the property he had owned at the time he prepared it.[31]

¶ 18 The other problem the financial statement presented for Braswell was the fact that this document, prepared in 1992, listed property that he had testified at the hearing on assets had been taken by the IRS two to four years earlier. At the contempt hearing, Braswell first tried to explain this by stating that the IRS had not taken all the

23. *Id.*

24. *Id.* at 22.

25. *Id.* at 42.

26. *Id.* at 63.

27. *Id.* at 62.
"... Second, is that when they were filled out, basically what I do is go in and sign it and my secretary will go through and fill out the financial. I gave my VA income. And they wanted to know, well, if your wife is being paid by the law firm or is employed by the law firm, we need to show that. That was the income for my wife."

28. *Id.*

29. *Id.*
"THE COURT: So that 3,000 a month is your wife?
MR. BRASWELL: That's my wife.
THE COURT: So she was making 3,000 a month in February of 1994?
MR. BRASWELL: That was the amount that would have been paid to her each month if we were able to pay, and that's what was put down on there for that loan— ..."

30. *Id.* at 48–49.

31. *Id.* at 32.

property at one time, but this failed to explain the fact that the dates he had given for the property seizures still antedated the financial statement.[32] Confronted with this irreconcilable conflict in dates, Braswell finally testified that the IRS had taken the properties only *after* the financial statement had been submitted to the bank.[33] Counsel pointed out the discrepancy between this last response and his testimony at the April 28, 1994 hearing on assets that the property had been seized on dates preceding the filing of the financial statement, and asked Braswell if his testimony at the hearing on assets had been the truth, to which Braswell responded, despite the obvious contradiction, that it had been.[34]

¶ 19 At the conclusion of the hearing, Judge Russell found Braswell in contempt for failure to comply with his original sanctions order.[35] Disturbed by Braswell's disregard of that order and by the contradictions in Braswell's testimony, Judge Russell sent a grievance letter to the Bar requesting an investigation into whether Braswell had violated the rules governing professional ethics.

¶ 20 At the PRT hearing, the Bar presented evidence that (1) Braswell had failed to comply with Judge Russell's sanction order for almost five years, (2) Braswell had committed perjury in the hearing on assets and in the contempt hearing before Judge Russell with respect to his and his wife's income and assets, and (3) Braswell had provided false information to Lincoln National Bank in the submission of financial documents relating to his income and assets.

¶ 21 In addition to re-offering the evidence outlined above, the Bar, having subpoenaed Braswell's trust account records, produced proof of checks written out of the trust account to Braswell's wife beginning in February, 1994, contrary to Braswell's testimony before Judge Russell that she had not been paid between September 1993 and the date of the contempt hearing, August 25, 1994. The Bar also produced evidence from Braswell's trust account records that after he was found in contempt by Judge Russell, he had paid at least a portion of the sanctions out of his trust account.

¶ 22 At the PRT hearing, Braswell continued to deny any wrongdoing in any aspect of this matter, expanding upon, but not substantively changing, his explanations for his failure to pay the sanctions order and for the discrepancies between his testimony and the financial documents.[36] Explaining the newly

---

32. *Id.* at 34:

"Q. Well, you testified they were taken in '88 or '89, and yet under a sworn financial statement June 30, '92, you represented you owned them. Which is true?
A. Counsel, the IRS wasn't at one period of time. They took some property early. Other properties were taken in '90 or '91 or whenever. I don't remember. I know that the IRS got them."

33. *Id.* at 43–44.

"THE COURT: Did something happen between June 30, 1992 and now which has made that $900,000 no longer worth $900,000?
MR. BRASWELL: Yes, sir.
THE COURT: What?
MR. BRASWELL: The land was lost and the—
THE COURT: You say the land was lost. What happened to the land?
MR. BRASWELL: The IRS got it.
THE COURT: That's what I'm trying to find out. Sometime after June of 1992, the IRS came in and took this property?
MR. BRASWELL: After that was submitted, the IRS came in and took it. . . ."

34. *Id.* at 45.

35. Judge Russell ultimately found that the second order, the one granting an appeal-related attorney's fee, was in the nature of a judgment and that Braswell could not be held in contempt for failure to pay it.

36. Again he asserted that the questions he had been asked at the hearing on assets and at the contempt hearing had been about his personal assets and his answers had been truthful. The financial documents obtained from Lincoln National Bank were submitted by and for his corporations. *See*, Transcript, PRT Hearing, August 22, 1996, at 276–277:

"Q. Why would you testify that you had not presented financial statements under oath when, in fact, you had presented two financial statements to Lincoln National Bank, one on June 30th, 1992, and one on February 9th, 1994?
A. Because the question they were asking about my specific assets of what I had specifically done relating to me and they had asked me to bring what I had in my possession of any financial statements that I had submitted. This question was based upon what they had in

found discrepancies between his testimony and his trust account records, Braswell claimed that at least some of the checks to his wife out of his trust account in 1994 were to pay her for work done in 1993 for which she had not been paid because funds were not available at that time. Braswell claims that his response to Judge Russell was that he had not paid her anything in 1994 for work done in 1994, not that he had not paid her at all in 1994.[37] Any other check to his wife in 1994 was for a reason other than payroll. He was unable to recall specifically what that reason might be, but he contends that Judge Russell's question related to *payroll* checks only, and therefore, his denial that she had received any checks in 1994 was true.[38]

¶ 23 In explaining his use of his trust account to pay the sanctions after he was found in contempt by Judge Russell, Braswell claims that only the first few such checks were written on his trust account. He maintained that this was not a misuse of his trust account because, although the checks came from his trust account, the funds themselves were not trust account funds. Rather they were funds representing fees earned that were in his trust account awaiting transfer into his professional corporation's operating account. When the sanctions payments came due, instead of taking the intermediate step of transferring the funds into the operating account and then paying the sanctions, he simply wrote the checks directly out of the trust account.

■ ¶ 24 The trial panel concluded that Braswell's failure to comply with Judge Russell's order to pay sanctions and the resulting contempt citation violated ORPC Rule 3.4(c),

which states that "[a] lawyer shall not knowingly disobey an obligation under the rules of a tribunal...." [39] We hold that the contempt citation speaks for itself as a violation of Rule 3.4(c). A disciplinary proceeding is not an appropriate forum to look behind the contempt citation to consider once again Braswell's extra-legal appeals protesting that he was wrongly found in contempt by Judge Russell.[40]

¶ 25 Braswell's attempts to reconcile his testimony with his financial documents and his trust account records fail to persuade us. His testimony that he did not prepare or present any financial statements after September 22, 1989, is contradicted on its face by the existence of a personal loan application and confidential financial statement for individual only, both *containing information relating to him as an individual and both signed by him with no indication that his signature was provided in other than his individual capacity.* As a legal practitioner, Braswell is presumed to know how to execute documents on behalf of a corporate entity. This was not done. In order to believe his after-the-fact testimony we would have to reject what we plainly discern on the face of the documents. Nothing Braswell has said convinces us to do so.

¶ 26 In considering the impact of the personal financial statement on the Bar's contention that Braswell committed perjury when he claimed to have no income, it is important not to lose sight of the forest for the trees and become mired in speculating whether this particular representation of income was accurate or not. On its face, of course, the representation of income on the personal loan application supports the Bar's contention on this point, and we are inclined to hold

---

front of them where they didn't have any financial statements because I had not given them any financial statements because I didn't have any in my possession and, in fact, on these two, I had basically gotten (*sic*) because they were, as far as I was concerned, for another corporation, not for me personally."

**37.** Transcript, PRT Hearing, August 22, 1996, at 311.

**38.** *Id.* at 327–328:

"Q. Why did you tell Judge Russell that she had not received any checks in 1994?

A. We were talking about payroll checks which is a true statement."

**39.** *ORPC, supra,* note 2, Rule 3.4(c).

**40.** *State ex rel. Okl. Bar Ass'n v. Wolfe,* 1996 OK 75, ¶ 16, 919 P.2d 427, 430. In his response brief, Braswell argues that there was never a specific date by which he was to pay the sanctions, that he was in the position of a judgment debtor awaiting collection procedures, and that when Judge Russell set a specific date for payment—at the time of the contempt hearing—he complied.

him to it. But it is not a necessary condition for our conclusion that Braswell's statement—that he never earned any income for his work as an attorney—is untrue because we believe that respondent's contention is simply ludicrous. It flies in the face of common experience. With the exception of volunteer work, people do not give away their labor for free unless under compulsion. Thus, even if income from the practice of law in the amount of $3,000 came to appear on his personal loan application in the manner respondent described, we would not be convinced that he testified truthfully that he had no income. The record provides ample evidence of funds from the law practice being paid to Braswell or related entities. Whether he considered this income or not is irrelevant. That he received funds from the law practice is clear, and his denial of any "income" is rejected.

¶ 27 We note that respondent's explanation of the genesis of the personal loan application, were we to accept it as true, would indicate that Braswell was unable to take care of his own personal financial transactions at a level expected of an average layperson. A lawyer certainly should know better than to permit another person to fill out a loan application for him and then sign it either before it is completed or without verifying its contents.[41]

¶ 28 Finally, even if we were to accept respondent's claim that the $3,000 per month represented his wife's income, his position would not be substantively improved. Instead of finding him in violation of one rule, we would find him in violation of another. Providing information to a bank in a loan application indicating that his wife had a certain level of income, knowing that she did not regularly earn that amount and that he had been unable to pay her at all for several months for lack of sufficient income, can only be described as dishonest and deceitful.

¶ 29 We turn now to the "confidential financial statement for individual only." The problem it presents for respondent is whether it accurately reflects his financial condition at the time he provided it to the bank. At one hearing he testified that he did not know whether he still owned the property at the time he listed it on the financial statement; at another he says he must have owned it since he listed it. His testimony about the various seizures of the property is vague and he offered no documentation to assist in determining whether he still owned the property at the time he prepared the financial statement.[42] At a minimum, Braswell's testimony regarding the status of these properties at the time he listed them on the financial statement is clear and convincing evidence of a reckless and cavalier lack of concern for providing the bank accurate information about his assets.

¶ 30 Nothing more charitable can be said regarding his testimony about checks made out to his wife in 1994. Braswell claimed at the PRT hearing that his response to Judge Russell that his wife had no income in 1994 had been truthful because the checks he paid her in 1994 were not for 1994 payroll, but for work done in 1993. Judge Russell asked Braswell about his and his wife's combined annual income, and Braswell's response was that his wife had not received a check in 1994

---

**41.** Transcript, PRT Hearing, August 22, 1996, at 291:

"A. [Braswell] ... I didn't fill out the application. I only signed it. I didn't even read the thing before I signed it."

**42.** *Id.* at 303:

"Q. Would you agree with me then if you're saying the IRS gave those back to you, that you should know whether or not the IRS gave those back to you at the time you listed those as assets in June of 1992 on your financial statement?

A. Yes.

Q. Did you know at the time the IRS had given those back to you when you put those on your financial statement in June of 1992?

A. The answer is yes.

Q. Do you remember testifying in your deposition that we took here at the bar association that you didn't know when you got those back?

A. That is correct.

Q. If you didn't know when you got them back, why would you put them on the bank application in June of 1992 as being owned by you?

A. When you look at the timing as to when something is asked, I gave the answer that I knew to be correct at that time."

" . . . because no funds—not enough funds have been coming in. . . . So as of this year, she has not received any payroll checks. And even last year, she only received payroll checks up until August—I'm sorry—September." [43]

The clear implication of this statement is that his wife had not been paid anything from the law practice up to the date Braswell was testifying before Judge Russell, August 25, 1994. To claim, as Braswell does, that this testimony is true even though he was paying his wife in 1994 for work done in 1993, is duplicitous. Furthermore, at least one other check was made out to Braswell's wife prior to his appearance before Judge Russell, and Braswell's contention that Judge Russell's question went only to payroll checks is unsupported by the record.

¶ 31 The trial panel concluded that Braswell violated ORPC Rule 3.3(a)(1), which states that a lawyer shall not knowingly make to a tribunal a false statement of fact or law; Rule 8.4(a), which makes it professional misconduct for a lawyer to violate or attempt to violate the ORPC; Rule 8.4(c), which states that it is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation; and Rule 8.4(d), which makes it professional misconduct for a lawyer to engage in conduct prejudicial to the administration of justice. We find that each of these violations has been established by clear and convincing evidence.

## IV

## COUNT TWO

¶ 32 *Count Two* of the complaint arises from a grievance filed by a man named William Henry Dixon. The grievance addresses itself to certain real estate transactions. The following facts are either undisputed or documented in the record: (1) Dixon purchased a house in 1986 from Braswell Enterprises, Inc., a corporation in which respondent owned a ninety percent interest and of which respondent was president at the time Dixon purchased the house. (2) Dixon financed the purchase of the house with an $85,000 loan from the Veterans Administration. (3) The Real Estate Purchase Contract on the house, dated September 17, 1986, contains the following typewritten notation initialed by Dixon and Braswell at paragraph 9: "9. SPECIAL PROVISIONS: seller to pay VA funding fee and closing costs." (4) On November 6, 1986, Dixon signed a document entitled "VA Application for Home Loan Guaranty," which contains the following borrower's certification: "I now occupy the above-described property as my home or intend to move into and occupy said property as my home within a reasonable period of time." (5) On November 14, 1986, the date the house sale was closed, Dixon signed a Veterans Administration document entitled "Report of Home Loan Processed on Automatic Basis", in which he made the following certification: "I now actually occupy the above-described property as my home or intend to move into and occupy said property as my home within a reasonable period of time." (6) On November 14, 1986, Dixon also signed a document stating that he intended to retain his then current residence for "rental purposes." (7) Within a few months of the purchase of the house, Dixon also purchased six townhouses from Braswell Enterprises, Inc. (8) Dixon borrowed approximately $300,000 to finance the purchase of the townhouses.[44] (9) Together, the mortgage on the house and the mortgages on the townhouses obligated Dixon to monthly payments of approximately $3,000. (10) Dixon's application for the VA loan shows his total monthly income to be approximately $3,500. (11) Dixon made no payments on the mortgages. (12) The lenders foreclosed upon all seven properties, and Braswell represented Dixon in some or all of the foreclosure pro-

---

**43.** Transcript, *Holmes v. First Security Bank & Trust Company*, Case No. CIV–89–94–R, Hearing Before the Honorable David L. Russell, United States District Judge, August 25, 1994, at 49.

**44.** The legal effect of Dixon's "purchase" of the townhouses is unclear from the record. Dixon testified that his accountant told him that the townhouses were never really his. *See,* Transcript, PRT Hearing, August 22, 1996, at 437. After the foreclosure, Dixon was never apprized of any additional liability he had on the properties. Documents pertaining to the foreclosure are not contained in the record.

ceedings. (13) Somehow Dixon was relieved of any further liability on the mortgages on the townhouses after they were foreclosed, but he is being pursued by the Veterans Administration for a deficiency on the loan for the purchase of the home in the amount of approximately $26,000. (14) In 1993, Braswell filed a lawsuit on Dixon's behalf against the United States in relation to the VA's attempt to collect the deficiency on the loan to purchase the house, and appeared in 1994 with Dixon at a deposition taken in that case by the U.S. Attorney on behalf of the United States. (15) The relationship between Braswell and Dixon prior to entering into the real estate transactions had been non-professional—they attended the same church and had served together on a church building committee.

¶ 33 The remaining facts, those giving rise to the charges of professional misconduct, are contested. Dixon claims that he entered into these real estate transactions based upon Braswell's misrepresentations as to his obligations and liabilities. He testified that Braswell induced him to buy these properties by telling him that he, Braswell, would "take care of the mortgages." Dixon testified that as a result, he did not really understand that he would be liable for payments on two mortgages totaling $385,000.[45] He testified that he signed most of the papers at Braswell's office, at Braswell's request, and that he or Braswell or both were always in such a hurry that he did not even know what he was signing.[46] Dixon claims he did not want to use his veteran's benefits to obtain the loan on the house, but that Braswell obtained his military serial number and somehow used it to arrange the VA loan without Dixon's knowledge or consent. He further claims that Braswell knew he had no intention of occupying the house and that he, Dixon, was unaware that the various documents he was signing contained certifications that he would occupy the house.

¶ 34 Dixon says that at some point he told Braswell that he wanted the house "out of my name." Shortly thereafter he received a letter from Braswell, which he no longer has, stating that the house had been sold to Gregory Glover, one of Braswell's stepsons. Still later he claimed Braswell told him that he had sold it to another of his stepsons, Michael.[47] According to Dixon, Braswell told him that he was "out from under it again" but "come to find out, I never did get out from under the house." [48]

¶ 35 In explanation of why he would sign documents without reading them, believe that he was not obligated on mortgages he signed, and throw away all the documents relating to these real estate transactions, Dixon testified that he thought of Braswell not only as his friend, but also as his attorney whom he could trust to take care of things for him.[49]

¶ 36 Later, after Braswell had filed on Dixon's behalf the lawsuit against the United States in connection with the deficiency on the VA loan, Dixon appeared at a deposition taken by the U.S. Attorney on behalf of the United States. His testimony in that deposition acknowledged understanding of the transaction resulting in the purchase of the house and confirming that it had been his intent to live in the house. Dixon's explanation for this testimony, which contradicts the

---

45. Transcript, PRT Hearing, August 22, 1996, at 397–398.

46. *Id.* at 396:
"Q. Is that the contract you and Mr. Braswell signed for the purchase of this house or a copy of that anyway?
A. To tell you the truth, I really don't know because we go over there and sign something—I'd go over there and—he'd call me over to the shop and want me to run over there—want me to run over there for a minute.
Well, at that time, I'd just run over there and run on in and sign the papers. He'd have a bunch of papers for me to sign. I didn't have time to read them because I had customers over at my shop and I run over there and signed the papers because I'm trusting him, you know, that he's going to do me right, ..."

47. *Id.* at 398.

48. *Id.*

49. *Id.* at 425:
"A. Well, like I say, if—if—say you were—you were my attorney and my friend and—and I put my trust in you, if you tell me that these things—that you was taking care of it, it was unimportant, throw it away, I'd probably do the same thing again."

essential allegations of his grievance, is that Braswell instructed him to lie at the deposition.[50] Dixon also claims that he did not know that Braswell had sued the federal government on his behalf.[51]

¶ 37 Braswell's version of events is quite different. He testified that Dixon came over to his house one night and inquired about buying some property from him. He agreed, as president of Braswell Enterprises, Inc., to sell him the seven properties involved here. According to Braswell, that is the full extent of his involvement in Dixon's real estate purchases. Braswell testified that he had never acted as Dixon's attorney up to that time and was not acting as his attorney in these real estate transactions. The purchases by Dixon were arms-length transactions between two businessmen. Braswell insisted that the paperwork, except perhaps for the Real Estate Purchase Contract, was handled by a real estate company and the mortgage lenders, and he had nothing to do with any of it. He denied making any representations to Dixon that would have caused Dixon to believe that he was not liable for making mortgage payments or that he, Braswell, would be taking care of the payments. He denied using information about Dixon to obtain the VA loan, and further denied knowing Dixon's intentions with respect to occupying the house. He denied that he had any responsibility to determine whether Dixon had the ability to pay the monthly mortgage payments, saying that it was the lenders' responsibility to make that determination. He further denied any obligation to provide legal advice to Dixon on any aspect of these transactions.

¶ 38 In addition, Braswell asserted in his response to the Bar's complaint and in his brief to this court that the Bar's complaint contained certain defects. First, he denies the applicability of the ORPC because they were not in effect at the time of the alleged acts. Second, he asserts that with respect to these real estate transactions, he and Dixon did not have an attorney-client relationship,

and that his conduct as president of Braswell Enterprises, Inc. lies outside the scope of the Bar's authority for imposition of discipline. Third, he claims that the Bar is precluded by the statute of limitations from disciplining him for acts which took place in 1986 and 1987.

■ ¶ 39 We agree with Braswell that the ORPC is not applicable to the real estate transactions which occurred in 1986 or 1987. The Code of Professional Responsibility was in effect at that time, and its provisions govern acts which occurred while it was in effect. The PRT in its report incorrectly applied the ORPC, but in its brief to this court, the Bar properly refers the court to The Code of Professional Responsibility with respect to those acts occurring in 1986 and 1987.

■ ¶ 40 We reject Braswell's other two assertions. The fact that he may not have had an attorney-client relationship before or at the time of the real estate transactions with Dixon is not fatal to the Bar's authority to investigate alleged unethical conduct. Discipline is not limited by the Code of Professional Responsibility to conduct which occurs in the course of the attorney-client relationship.[52] This court has the inherent power to discipline lawyers qua officers of the court. Its power extends to acts outside the scope of one's professional practice where the offending conduct bears on the practitioner's fitness to practice law.[53]

■ ¶ 41 This court has not considered whether a statute of limitations can be invoked in a disciplinary proceeding. Neither the ORPC nor its predecessor, the Code of Professional Responsibility, contains an express statute of limitations governing disciplinary proceedings, and we decline to create one. This court's responsibility to protect the interests of the public and of the legal profession require flexibility. A hard-and-fast rule establishing a time limitation on investigating attorney misconduct and on im-

**50.** Transcript, PRT Hearing, August 23, 1996, at 584.

**51.** *Id.* at 599.

**52.** *State ex rel. Okl. Bar Ass'n v. Smith*, 1980 OK 126, ¶ 16, 615 P.2d 1014, 1017.

**53.** *State ex rel. Okl. Bar Ass'n v. Pate*, 1967 OK 175, ¶ 21, 441 P.2d 393, 397.

posing discipline where warranted would interfere with this responsibility. Unless from the circumstances of the particular case it appears that it would be unjust or unreasonable to require a lawyer to respond to a grievance, we hold that no time period will *per se* bar a proceeding against a lawyer.

¶ 42 Turning to the substance of the allegations against Braswell, we begin by stating that *we do not find clear and convincing evidence* that Braswell was Dixon's attorney for purposes of the initial real estate transactions.[54] The two men had no prior attorney-client relationship. Dixon initially approached Braswell about becoming involved in the construction business or investing in real estate. The initial contact was made by Dixon in Braswell's home, not his law office. They had no explicit agreement that Braswell would represent Dixon's interests in these transactions with Braswell's corporation. Nor do we find clear and convincing evidence which would justify imputing the attorney-client relationship under these circumstances. The fact that Braswell is an attorney does not mean that he cannot engage in an arms-length transaction to sell property to another person without an implication arising that he will exercise his professional judgment for the protection of the other person's legal interests.

¶ 43 Dixon claims that Braswell was instrumental in obtaining financing, preparing documents, causing him to sign documents, and generally pushing the transactions forward, thereby giving Dixon, an individual unsophisticated in such matters, the reasonable impression that he was acting as his attorney. Were the evidence clear and convincing that Braswell in fact did all of these things, we might agree, but on these points the record is far from clear and convincing.

Dixon apparently has thrown away any documents that might have supported his claim of reliance on Braswell as an attorney, and the documents in the record do not demonstrate that Braswell's participation in the property sales was anything other than that of a seller. We must hence reject the Bar's complaint that, with respect to the initial sales of the real estate, Braswell violated the disciplinary rule governing business relations with a client.[55]

¶ 44 Even if Braswell was not acting as Dixon's attorney at the time of the initial sales, if he misled Dixon into believing that he would take care of all the mortgage payments on the seven properties in order to induce Dixon to buy them, if he used information Dixon gave him to secure a VA loan without Dixon's knowledge and consent, or if he participated in fraudulent statements by Dixon to the lenders or to the Veterans Administration, he would still be subject to discipline for dishonest conduct, regardless of the capacity in which he was acting. In none of these aspects is the record proof clear and convincing.

¶ 45 As for his liability on the mortgages, Dixon, whatever his level of education or sophistication, does not appear from the record to be incapable of understanding that most basic fact of real estate lending: if you borrow money, you are legally obligated to pay it back. Dixon had obtained at least one previous mortgage, he ran a business, and he had spent years in the military. It is simply not believable that a man of his age and life experience would not have known that he was responsible for the payment of mortgages he signed. In the absence of any evidence other than Dixon's testimony, we cannot find that Braswell misled him into a reasonable

---

**54.** The purchase of the home occurred in September 1986. Dixon testified that Braswell first represented him in a legal matter only after his retirement, which occurred on August 31, 1986. He further attempted to pinpoint the time that Braswell first represented him by testifying that it had been around the time the real estate transactions were taking place. Dixon's testimony is too vague for us to be able to conclude that the representation preceded or was contemporaneous with the real estate transactions. *See,* Tran-

script, PRT Hearing, August 22, 1996, at 386–387 and 427.

**55.** Code of Professional Responsibility, DR–5–104, 5 O.S.1981, Ch. 1, App. 3:

"A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure."

belief that he was not going to have to pay the mortgages.

¶ 46 It is equally unlikely, based upon the record, that Dixon was not aware he was applying for a VA loan. Looking at the Real Estate Purchase Contract, one's attention is immediately drawn to the center of the page, to the only material that is not boilerplate: the typed-in provision referring to a VA loan. Nothing in that contract could be more visually plain. Other documents signed by Dixon also make this apparent. We cannot find clear and convincing evidence here that Braswell misled Dixon or perpetrated any chicanery in the use of Dixon's veterans' benefits.

¶ 47 Dixon and Braswell provided conflicting testimony about whether Dixon ever intended to move into the house or whether it was always his intent to rent it. Dixon testified that Braswell knew he never had any intention of moving into the house, but nevertheless caused him falsely to certify to the VA that he would be moving into it. Braswell claims Dixon indicated to him that he was interested in moving, but insists that it was not of any concern to him because he had no knowledge of the representations Dixon made to the mortgage company financing the purchase or to the Veterans' Administration about his intentions. Again, while it is possible Braswell advised Dixon to misrepresent his intentions to the VA, the evidence that it happened in this way is not clear and convincing. The documents do not support Dixon's version. Although he claims never to have read them and to have had no knowledge of their contents at the time he signed them, Dixon cannot deny that he did in fact sign them and they do in fact say what he now claims was untrue. Whether he made this misrepresentation on his own initiative or at Braswell's suggestion was not established to the degree necessary for us to subject Braswell to professional discipline.

¶ 48 The record does reveal that sometime after the initial purchases, Braswell began to represent Dixon in his capacity as legal practitioner. The record reflects that Braswell represented Dixon with respect to some property in Arkansas sometime after Dixon retired in 1986, but a specific date was not made clear. The next time it appears in the record that Braswell represented Dixon is in the foreclosures of the townhouses sometime in 1987.[56] We can thus safely conclude that at least by January 1, 1988, Braswell had represented or was then representing Dixon as his attorney on one or more legal matters, bringing into play the disciplinary rules applicable to the attorney-client relationship.

¶ 49 It was at this time that Dixon testified he approached Braswell about getting out of his obligation on the house.[57] Dixon stated that he believed Braswell was going to arrange it so that he would no longer be liable for the mortgage.[58] Braswell agreed that Dixon had approached him about selling the house and he testified that he told Dixon he would try to find a buyer.[59] Dixon testified that he received some letters from Braswell informing him of the sale of the house. Braswell first told him he had sold it to his older stepson and then later came back to him and said he had sold it to his younger stepson, Michael.[60] Dixon testified that the letters about each of these sales of the house led him to believe that he had been released from the mortgage.[61] Dixon apparently threw away any such letters.

56. Transcript, *State ex rel. Okl. Bar Ass'n v. Michael Braswell*, OBAD # 1216, SCBD # 4117, Deposition of Michael Braswell, December 19, 1995, at 56.

57. Transcript, PRT Hearing, August 22, 1996, at 398. ("... I told him I wanted it—I wanted it out of my name and everything....")

58. *Id.* at 442. ("And like I said, they—he was supposed to have been getting me relieved of it and I'm—I still have it.")

59. *Transcript, Deposition, December 19, 1995, supra,* note 56 at 46.

60. Transcript, PRT Hearing, August 22, 1996, at 398. ("That's his youngest stepson and he was saying I was out from under it again. Well, then, come to find out, I never did get out from under the house. I'm still under the house.")

61. *Id.* at 441:

"MS. FEAVER: Mr. Dixon, did you say that Michael Braswell's brother or stepson bought the Highley property at the sheriff sale on foreclosure?

THE WITNESS: Well, I don't know how—whether it was his stepsons. Both of them supposed to had it, but like I said, they

¶ 50 Braswell emphatically denied that he was acting as Dixon's attorney in selling the house, and he did not remember whether he explained to Dixon any of the legal ramifications of the sale. Braswell claims that everything Dixon needed to know was in the paperwork completed through the mortgage company.[62]

¶ 51 We find that at the time Dixon approached Braswell for assistance with his financial obligation on the house, Braswell had already acted on one or more occasions as Dixon's attorney, and Dixon was justified in expecting Braswell to treat this matter as one involving him in his relationship to Braswell as Braswell's client, and not just as another aspect of their business relationship. Having found that Braswell was in an attorney-client relationship with Dixon, we conclude that Braswell, in failing to inform Dixon of the legal ramifications of the sale of the house on his financial obligation to the lender, failed to meet his professional obligation to Dixon in violation of ORPC Rule 1.4(a).

That rule requires a lawyer to keep a client reasonably informed about the status of a matter. Moreover, we also conclude that Braswell violated Rule 1.4(b), which requires a lawyer to explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.[63]

¶ 52 The PRT found clear and convincing evidence that Braswell either prepared or allowed Dixon to commit perjury at the deposition before the U.S. Attorney. Braswell denied shaping Dixon's testimony or improperly coaching him on his testimony. Dixon began by testifying with certainty that Braswell had told him to lie in response to certain questions, but on cross examination, he admitted that he could not remember any particular questions on which Braswell had coached him to lie. As he was asked about specific questions and answers, he was forced to admit that he also lied on his own initiative, concluding with the well known adage,

would—he was giving me, you know, papers saying that he had sold it to them or this—they were buying it and—but after—after it all was over, come to find out, I think it was typed up—I think he just had someone in his office to type up these papers to give me to shut me up.

MS. FEAVER: I didn't understand that.

THE WITNESS: I said his—his stepsons, both of them, Greg and Michael, both of them, at one time or another, supposedly had the house.

MS. FEAVER: Had moved into the house?

THE WITNESS: No, it was just on paper, I think, but they were supposed to have been buying the house and then—then like I said, I think he gave me the letter to these effects and these was some of the stuff he told me to throw away, but after it was all over with, I think it must have been—these letters must have been typed up in his office and he, you know, just had the secretary to type them up and give them—give me a copy of them because they never moved in it.

MS. FEAVER: Okay

THE WITNESS: And like I said, they—he was supposed to have been getting me relieved of it and I'm—I still have it."

**62.** *Transcript, Deposition, December 19, 1995, supra,* note 56 at 48–50.

"Q. Did you explain to Mr. Dixon when he transferred this property out of his name that that would not get him out of the obligation on the mortgage, that if it were foreclosed on they could would still come after him; was that explained to him?

A. Again, I don't remember whether it was explained in details, everything was right there *in front of him*....

Q. Well, you testified that he wanted to get it out of his name?

A. He wanted to just get it out of his name. He said, I want my name off of that. And I said, okay, whatever you want to do, we'll try to find a buyer....

Q. Did you explain to him that the only way he could get his name off of it was to either pay off the mortgage or have someone get a now (*sic*) loan on it, I'm talking about on the mortgage?

A. Yeah, that was understood, yeah.

Q. You explained that to him?

A. Again, I can't say yes or no. I can only go by what occurred at the time. And from what occurred with him when it was foreclosed upon, he wasn't surprised that his name was on there. ....

Q. Do you think he relied on you as an attorney to try to help him with this situation when he bought the property and when the property wouldn't rent out?

A. The answer is an emphatic no...."

**63.** *ORPC, supra,* note 2, Rule 1.4. The deed to Braswell's stepson is dated October 31, 1988. The ORPC went into effect July 1, 1988. Some or all of Braswell's conduct in this matter took place after the ORPC took effect, making the ORPC, rather than the Code of Professional Responsibility, applicable to his conduct.

"... once you tell one lie, then you've got to tell another one." [64] We conclude that the evidence against Braswell in this instance is not clear and convincing.

## V

### COUNT THREE

¶ 53 *Count Three* of the complaint arises from a grievance filed by William Bonney, a Chapter 13 bankruptcy trustee for the Eastern District of Oklahoma. At the PRT hearing, Mr. Bonney testified that Braswell filed a bankruptcy case in the United States Bankruptcy Court for the Western District of Oklahoma for a man named James E. Woodward. Mr. Woodward paid Braswell a fee of $880. A creditor, claiming improper venue, moved to transfer the case to the Eastern District. Braswell failed to file a timely response to this motion, and the case was transferred. The case was assigned to Mr. Bonney, who proceeded to review the schedules. He found them to be handwritten and incomplete, with substantial property omitted. He called Braswell and asked that he and the debtor fill out the schedules properly and provide him with certain documents which he routinely requires. No action was taken and then, for some reason, this bankruptcy case was dismissed. Bonney then found another attorney to file a second bankruptcy case for the debtor.

¶ 54 In this second bankruptcy, Bonney filed a motion under 11 U.S.C. § 329 to require Braswell to turn over the $880 attorney fee the debtor had paid Braswell to file the first bankruptcy case, claiming that Braswell's services had been without value. Braswell did not file a timely response to the trustee's motion, and on April 26, 1994, the bankruptcy court entered a default order requiring Braswell to turn over the $880 fee within ten (10) days. Bonney provided a copy of the order to Braswell and over the next two months had at least one telephone

conversation with him and one written communication requesting compliance with the court's order. The fee was not forthcoming.

¶ 55 On July 19, 1994, when Braswell had still not complied with the court's order, Bonney sent Braswell a second letter demanding payment, copying the letter and the order to the Bar. Braswell failed to respond to this letter as well, but instead wrote a letter to the judge who had issued the order, asking him to "reevaluate" the situation.

¶ 56 Bonney tried periodically over the next several months to obtain the money from Braswell to no avail. He spoke to a representative of the Bar who informed him that Braswell was taking the position that the court's order was interlocutory and he did not have to pay it at this time. The Bar indicated that it could take no action. Finally, on January 19, 1995, almost nine months after the turnover order had been entered, the trustee filed an Application for Contempt. On February 13, 1995, two days before the scheduled contempt hearing, Braswell finally sent a check to the trustee for the amount of the fee.

¶ 57 Braswell testified that the schedules were handwritten and incomplete because the debtor did not come to him until the day the bankruptcy had to be filed. He also testified that he appeared at two § 341 hearings, the first one being continued because the debtor failed to appear. He explained his failure to respond to the creditor's motion to transfer the case to the Eastern District by claiming that the motion, mailed from the bankruptcy court for the Western District of Oklahoma, did not arrive at his office until after the time to respond had run.[65] He explained his failure to respond to the trustee's turnover motion by claiming that he had not in fact failed to respond, but had mistakenly sent his response to the wrong court clerk, timely filing it, but in the wrong court.[66] He testified that when he received

---

**64.** Transcript, PRT Hearing, August 23, 1996, at 593.

**65.** Transcript, PRT hearing, August 23, 1996, at 537 ("... —when you get mail out of Muskogee area, Okmulgee—Muskogee–Okmulgee area, it

runs pretty late. The time had basically gone for the response.").

**66.** *Id.* at 538 ("I responded on a timely basis. It was sent to the court that it's normally sent to which is the general court in Muskogee but the bankruptcy was held in Okmulgee. I didn't

the default order, he "responded to the Court and asked him to reconsider what they'd done because I had to show them all the documentation."[67] Finally, he testified that the reason he did not comply with the court's order was that he did not have to comply until the time to appeal it had expired. He testified that there were two statutes governing the time in which to appeal the order, one of which permitted him to file an appeal up to one year from the date of the order.[68] He did not identify the statutes to which he referred.

¶ 58 The trial panel concluded that Braswell had violated ORPC Rule 3.4(c), which states that "[a] lawyer shall not knowingly disobey an obligation under the rules of a tribunal...." *We agree.* We also find that Braswell's failure to comply for almost ten months with the court's order violates Rule 8.4(a), which makes it professional misconduct to violate or attempt to violate the ORPC. The bankruptcy court's turnover order was a valid order requiring compliance within the time stated. Braswell presented no credible evidence that he took the proper procedural steps to have the court reconsider its order, to stay its effect, or to appeal it. *He simply ignored it.*

¶ 59 Braswell's contention that he did not have to take any action with respect to the order for up to a year is utterly groundless. He testified that he had two possible avenues of appeal. While not identifying the statutes on which he was ostensibly relying, he testified that he had thirty days to appeal under one statute and one year under another. In his response brief to this court, Braswell cites 28 U.S.C. § 2107 for the thirty-day appeal time and Rule 60 of the Federal Rules of Civil Procedure for the one-year time limit. We assume that this statute and this rule were also the basis of Braswell's testimony.

¶ 60 Title 28 U.S.C. § 2107 is the federal statute setting the time within which a notice of appeal from the district court must be filed. Section 2107(d) states unambiguously: "This section shall not apply to bankruptcy matters or other proceedings under Title 11."[69] The time to file a notice of appeal in a bankruptcy proceeding is governed by Rule 8002 of the Rules of Bankruptcy Procedure.[70] That time is ten days, not thirty days as in a civil appeal. Braswell's misplaced reliance on Section 2107, which is so patently apparent on its face, suggests a profound lack of good faith in addressing the Bar's complaint, the PRT, and this court. Even if Braswell could rely on Section 2107, at best he could only argue that it authorized him to delay compliance with the order for thirty days. He has wholly failed to explain how it justifies his failure to obey a court order for a period of almost ten months.

¶ 61 Respondent's reliance on Rule 60 of the Federal Rules of Civil Procedure is equally groundless. Rule 60 provides a method of seeking relief from a judgment or order. It is not a substitute for an appeal.[71] It is applicable to bankruptcy proceedings through Rule 9024 of the Federal Rules of Bankruptcy Procedure. As with Section 2107, we fail to see how Rule 60 supports Braswell's failure to comply with the bankruptcy court's order. Rule 60(b) states, "... [a] motion under this subdivision (b) *does not* affect the finality of a judgment or *suspend its operation.*" (emphasis added) The order gave Braswell ten days in which to comply.

know that the clerk in Muskogee was the one to initially get it because that's where everything goes initially anyway. It was sent to the regular clerk on time.").

67. *Id.* at 539.

68. *Id.* at 553–554.

69. Appeals in bankruptcy cases are governed by Fed.R.Bankr.P. Rule 8001.

70. Fed R.Bankr.P. Rule 8002:

"*Ten Day Period.* The notice of appeal shall be filed with the clerk within 10 days of the date of the entry of the judgment, order, or decree appealed from."

See also, Advisory Committee Note:
"This rule is an adaptation of Rule 4(a) F.R.App.P. The time to appeal from a judgment, order, or decree of a bankruptcy judge is 10 days, rather than the 30 days provided for in the civil practice. The shortened time is specified in order to obtain prompt appellate review, often important to the administration of a case under the Code."

71. *Latham v. Wells Fargo Bank, N.A.*, 987 F.2d 1199, 1203 (5th Cir.1993); 11 Charles Alan Wright et al., Federal Practice and Procedure, § 2851, at 229 (2d ed. 1987).

Rule 60 *by its terms* does not suspend the order's operation, and Braswell provides no authority for an interpretation of that provision that is contrary to its explicit terms.

¶ 62 Moreover, Rule 60 does not automatically give a litigant a full year to make a motion for relief. A Rule 60 motion on any of the grounds upon which Braswell might reasonably believe he could rely requires that the motion be made in a reasonable time within the one-year period. Assuming that Braswell had grounds to make a Rule 60 motion under these circumstances, there is absolutely no authority under Rule 60 for the position he has taken that he can delay compliance with a court order for an entire year while sitting upon his right to file a Rule 60(b) motion until the entire year has expired.[72]

■■■ ¶ 63 In our view, Braswell's contention that Section 2107 and Rule 60 support his disobedience to and disregard of a valid court order is frivolous, serving only as an attempt to mislead the court that there is a legal justification for his inexcusable failure to comply with a court order until he was threatened with contempt. No such justification can be discerned from the invoked statute or from the rule. It is painfully obvious that respondent made no effort to determine the applicability of the law he cited in his testimony and in his brief. Citing authority without a reasonable basis for believing it to be applicable wastes valuable judicial time and resources. We find such conduct to be sanctionable as a violation of ORPC Rule 3.3(a).

## VI

### COUNT FOUR

¶ 64 *Count Four* of the complaint arises from a grievance filed by a client of Braswell's named Louise Bowen. On July 1, 1994, the Bar received a handwritten letter from Bowen relating that for the previous year she had tried repeatedly, but unsuccessfully, to obtain certain funds belonging to her which were in Braswell's possession. She explained that Braswell had represented her in a wrongful discharge action. The case had been settled for $35,000, as evidenced by a check dated July 23, 1993, endorsed by Bowen and deposited in Braswell's trust account. Braswell took $5,000 of the settlement off the top as expenses. The remaining $30,000 was to be split equally between Bowen and Braswell. Bowen received $7,000 in the form of a check written on Braswell's trust account approximately one month after the settlement check had been deposited, but as of the date of her letter to the Bar, Bowen had been unable to obtain the remaining $8,000 owed to her. Six months after Bowen sent the grievance letter to the Bar and one day before Braswell was to be deposed for the first time in relation to Bowen's grievance, Bowen received a telephone call from Braswell asking her to come to his office to fetch her money.

¶ 65 Braswell was deposed in the Bowen matter for the first time on December 8, 1994, a year and a half *after* he had first deposited the settlement check in his trust account. At this deposition, Braswell testified that when he wrote Bowen the check for $7,000 on August 27, 1993, the settlement check had still not cleared and he had to "advance" her the money.[73] He testified that he did not give her the remaining $8,000 of her settlement because she had told him she did not want it all at that time.[74] Braswell testified that sometime after the settlement

---

**72.** FEDERAL PROCEDURE, L.ED., § 51:192, at 466–467 (1997) ("The 'reasonable time' requirement applicable generally to FRCP 60(b) motions is not displaced by the one-year maximum limit. Rather, to be timely, FRCP 60(b)(1)–(3) motions must be filed within a reasonable time within the one-year period. Thus, although made within one year, such motions are untimely if they are not made within a reasonable time. For instance, a motion for relief under FRCP 60(b)(1) on the ground of judicial inadvertence or the like should be filed within the time allowed for filing an appeal, in order to assure that the motion is not used as a substitute for an appeal.")

**73.** Transcript, In re: Grievance Against: Michael Braswell, DC 94–234, Deposition of Michael Braswell, December 8, 1994, at 28.

**74.** *Id.* at 27.
"A. [Braswell] Because at the time, all the funds had not cleared, and she said, I really don't want it all. I just need this. Because she had this problem over here with bill collectors constantly coming. She said, okay...."

he had taken the remaining $8,000 belonging to Bowen out of his trust account and put it in cash in his safe where it remained until Bowen had come to pick it up the day before the deposition.[75] He could not remember exactly when he had taken it out of his trust account or whether he had taken it out in one lump sum or in increments over time.[76] He had not brought any documentation to support his testimony and he *refused a request to execute a release of his trust account records for the purpose of verifying his testimony.*[77]

¶ 66 The Bar subsequently subpoenaed the trust account records, from which it was impossible to verify Braswell's testimony. The trust account records did show that by August 31, 1993, none of Bowen's $15,000 remained in the trust account, the balance of which had by then been reduced to $26.99.

¶ 67 A second deposition of Braswell was taken on April 12, 1995.[78] Braswell again testified that he had put Bowen's $8,000 in his office safe in cash, but now related that it had not come out of his trust account, but rather had come out of the proceeds of a cash loan to him from a bail bondsman, which he had secured prior to the Bowen settlement. He testified that he borrowed money from the bondsman whenever he needed to, and that the loans were strictly on a cash basis with no paperwork documenting the loans or their repayment.[79] The bondsman never testified during the disciplinary proceeding. Braswell had made no notation on a file or anywhere else to document that the money had been sitting in his safe since sometime near the date of the settlement.

¶ 68 Braswell also testified that he had called Bowen an unspecified number of times to request that she come in and retrieve her money. He claimed that a person who sounded to him like an adult answered the phone and he left a message, but Bowen never called him back. When she finally came in on December 7, 1994 to get her money, Braswell claims that she told him that her ten-year-old daughter (*sic* ) often answered the phone and did not reliably give her messages.[80] Braswell stated that he had no telephone records to support his testimony regarding calls placed to Bowen.[81] He denied that Bowen ever called him.[82] He testified that after receiving notice from the Bar that Bowen had filed a grievance against him, it never dawned on him to inform the Bar that he had Bowen's money sitting in his safe waiting for her to come and get it.[83] Nor did it occur to him to send someone from his office to find her as he had done on a previous occasion when he had to contact her.[84]

¶ 69 At the PRT hearing, Bowen offered a few additional details. She testified that prior to the settlement, Braswell had never told her that he was going to take fifty percent of the recovery as his fee.[85] She had assumed that his contingent fee would be thirty percent because that was the arrangement she had had with him in a previous case. She knew nothing about the $5,000 in expenses until the day she went to endorse the check. She never saw any documentation of the expenses.[86] Bowen testified that when she finally went to Braswell's office on December 7, 1994, Braswell presented her with two documents to sign, one stating that she was satisfied with his representation and the other stating the fee arrangement. She testified that she was not satisfied, but signed the documents anyway because she

**75.** *Id.* at 23.

**76.** *Id.*

**77.** *Id.* at 31.

**78.** In re: Grievance Against: Michael T. Braswell, DC–94–197 (William Dixon), DC–94–234 (Louise Bowen), and DC–94–342 (David Russell), April 12, 1995.

**79.** *Id.* at 52, 56–57.

**80.** *Id.* at 54.

**81.** *Id.* at 84.

**82.** *Id.* at 76.

**83.** *Id.* at 72 and 80.

**84.** *Id.* at 75.

**85.** PRT Hearing, January 17, 1996, at 53–54.

**86.** *Id.* at 24.

felt it was necessary in order to get her money.[87]

¶ 70 Mrs. Bowen went into additional detail about her attempts to obtain her money from Braswell, including numerous phone calls between August, 1993 and January 1994, in which she talked directly to Braswell, who, she testified, gave her various excuses why her money was not available.[88] She testified that he had originally told her it would take three weeks for the check to clear. She had waited until almost four weeks had passed before she called him, at which time he told her that the check had still not cleared.[89] She testified that she had Caller ID, but Braswell's phone number never appeared on it except for a few occasions. On those occasions, she returned his phone calls, and he told her that her money was not available.[90] Bowen denied ever requesting that Braswell pay her in cash.[91] She denied that her granddaughter failed to give her messages.[92]

¶ 71 Braswell's testimony at the PRT hearing was consistent with his testimony in the April 12, 1995, deposition that he had

borrowed money from a bail bondsman and had segregated $8,000 out of that cash, putting it in an envelope in a safe waiting for Bowen to come in and get it. Braswell agreed that by the end of August 1993, Bowen's remaining $8,000 was no longer in his trust account, the balance having been reduced to $26.99.[93] He insists that this is not evidence that he had converted Bowen's money though because her $8,000 was sitting in cash in his safe by that time. In fact, he claims that he originally had almost the entire amount owed to Bowen, almost $15,000, in cash and therefore, the fact that he did not have a $15,000 balance in his trust account prior to paying her the $7,000 is not evidence that he misused Bowen's funds.[94] As for why he did not just give her the $8,000 cash when she came in to obtain the $7,000 check, Braswell explained that he did not do so because Bowen did not ask for it.[95]

¶ 72 Undermining Braswell's "cash-in-the-safe" version of the Bowen settlement funds was the discovery from his trust account records that on December 7, 1994, the

87. *Id.* at 40:

"Q. . . . Are you telling us today that on Complainant's Exhibit 5 where you signed stating quote, I acknowledge that I am completely satisfied with the above settlement, with the services of my attorney, and with the amount of the fee charged, end of quote, that that was not a true statement when you signed it?
A. No, it wasn't a true statement.
Q. Why did you sign it then?
A. Okay. I had contacted the bar association and after contacting the bar association, attorney Braswell finally got in contact with me and I just thought this was legal. Attorney Braswell represents the law. He can make or break a law. He can make and break a judge, so I thought this was for me to do."

88. *Id.* at 27.

89. *Id.* at 25.

90. *Id.* at 47.

91. *Id.* at 48.

92. *Id.* at 49.

93. *Id.* at 96.

94. *Id.* at 223–224.

95. *Id.* at 233–234.

"MR. BURTON: Where was the $8,000 in cash from the time that she was given the $7,000 until she was finally paid?
THE WITNESS: Over in the safe.
MR. BURTON: So you had $8,000 in cash in your safe.
THE WITNESS: That's correct.
MS. FEAVER: Is it your testimony that on the day you gave her the $7,000 check, you had over $10,000 in your safe?
THE WITNESS: That's correct.
MS. FEAVER: But for whatever reason, you didn't give her her $8,000 out of that $10,000?
THE WITNESS: She did not ask. The only thing she wanted—because I asked her if she wanted more. She said no, I want 7 and she wanted—I told her I can't do it in cash. I've got to do it in a check because I was running at the time and she said okay—
MS. FEAVER: Okay. Now, let me stop you there. If you say you have 10,000 in your safe, you could have opened your safe and given her the 8,000; is that correct?
THE WITNESS: I could have, but she never asked for it. She only wanted the 7 and, in fact—
MS. FEAVER: Okay. So Mr. Braswell, the reason you didn't give her the rest of her part of the settlement was because she didn't ask for it?

very day he finally gave Bowen her money, he had written a check to himself for exactly $8,000.[96] He was unable to explain the purpose of the check,[97] thereby failing to dispel its obvious implication—that he had not kept Bowen's $8,000 in cash in his safe for the previous eighteen months, but rather that he was paying Bowen out of his trust account at that time.

¶ 73 When the PRT received its second day of testimony seven months later, Braswell presented a witness whose testimony was supposed to prove that the $8,000 check made out to himself from his trust account on the day he paid Bowen was not written to provide him the cash to pay her. This witness testified that sometime in December 1994, Braswell had paid him $7,500 in cash as repayment of a cash loan the witness had made to Braswell earlier in the year.[98] Neither the witness nor Braswell had any documentation of the cash loan or the cash repayment[99] and when pressed, the witness was unable to say definitely when Braswell had repaid him.[100]

¶ 74 The undisputed evidence is that Bowen did not receive the balance of her funds until six months after filing a grievance with the Bar. The documented evidence shows that Braswell wrote out a check payable to himself from his trust account on December 7, 1994, in the amount of $8,000 and on that very day paid Bowen $8,000 in cash. He provided nothing to show that he had documented the unorthodox method he claimed he had chosen to hold Bowen's funds for her. He had no phone records and produced no employee from his office to substantiate his attempts to contact Bowen, nor challenge Bowen's claims that she repeatedly called his office. Finally, his witness in support of his claim that the December 7, 1994, check for $8,000 was to obtain cash to repay a loan was unable to credibly pinpoint when Braswell had actually repaid him. Again, no documentation of any aspect of this purported transaction was presented.

THE WITNESS: Yeah. She didn't ask for it. . . .''

¶ 75 The PRT found Braswell's testimony as to Bowen's settlement funds *convoluted and contradictory. We would add that it strikes us as highly improbable.* We do not believe that a woman of limited means raising five grandchildren would voluntarily leave $8,000 in her attorney's office, never inquire about it for eighteen months, go to the trouble of composing a lengthy handwritten account of her attempts to recover her money, and then commit perjury claiming that she had repeatedly, but unsuccessfully, tried to get it. We do not believe that Braswell had $8,000 in cash set aside in his safe waiting for Bowen to come and get it, wanted to give it to her for a year and a half, but had been unsuccessful in contacting her despite many efforts. Finally, we do not believe that the $8,000 check Braswell wrote to himself on December 7, 1994, was to repay a loan to a friend, rather than to obtain the cash to pay to Bowen that very day.

¶ 76 The trial panel concluded that Braswell had violated (1) ORPC Rule 1.5(a), which requires a lawyer to "hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property;" (2) ORPC Rule 1.5(b), which requires a lawyer to "promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive;" (3) ORPC Rule 1.5(b) by failing to "promptly render a full accounting" of the client's property upon request; (4) OPRC Rule 1.4, by failing to keep his client reasonably informed about the status of her settlement funds and failing to promptly comply with his client's reasonable requests for information; (5) ORPC Rule 1.5(c) by failing to comply with the requirement that a contingent fee arrangement be reduced to a writing which includes specified information, including how reimbursement of litigation and other expenses is to be handled, and by failing, upon conclusion of the contingent fee

**96.** *Id.* at 178.

**97.** *Id.* at 191.

**98.** Transcript, PRT Hearing, August 22, 1996, at 444–445.

**99.** *Id.* at 452.

**100.** *Id.* at 464.

matter, to "provide the client with a written statement stating the outcome of the matter, and, if there is a recovery showing the remittance to the client and the method of determination;" (6) ORPC Rule 8.4(c) prohibiting a lawyer from engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation; and (7) RGDP Rule 1.4 for failing to use funds entrusted to him for the purpose they were so entrusted, and for intentionally and fraudulently converting funds of a client to his own use. We find that each of these violations has been established by clear and convincing evidence.

## VII

### RESPONDENT EGREGIOUSLY MISUSED HIS TRUST ACCOUNT

¶ 77 We next discuss the Bar's evidence that respondent misused his trust account on numerous occasions and in a highly egregious manner. The Bar did not present this evidence as a separate count and much of the proof of Braswell's misuse of his trust account came to light in connection with Bowen's grievance. A comprehensive recital of the evidence of Braswell's misuse of his trust account would encompass far too many pages and serve no useful purpose. We limit our discussion to a summary of the PRT's findings, which we adopt on *de novo* review.

¶ 78 The PRT found that Braswell used his trust account as a general operating account for his law practice as well as for the deposit and withdrawal of funds for personal and business purposes. Despite requests from the panel, Braswell was unwilling or unable to provide plausible explanations or documentation that could lead the panel or this court to any other conclusion. Among the many improper uses Braswell made of his client trust fund are: (1) commingling his own personal funds with client funds in the trust account, (2) failing to keep adequate records of frequent cash deposits into his trust account, (3) repeated insufficient funds charges levied against the trust account, (4)

cashing checks for his brother by running them through his trust account, (5) repaying himself from the trust account for undocumented "loans" he claims to have made from his personal funds for operating and other law practice expenses, and (6) failure to keep adequate records to explain frequent checks from the trust account made out to himself, his wife, his family members, and his business interests. Other irregularities have already been mentioned in connection with Judge Russell's grievance. These are the payment of personal sanctions and "payroll checks" to his wife out of his trust account. The court finds that this conduct constitutes a pattern of abuse of respondent's trust account in violation of ORPC Rule 1.5 and RGDP Rule 1.4.

¶ 79 We note that respondent's abysmal record-keeping [101] and his unwillingness or inability to provide records to the Bar and to the PRT, including the manner in which he claims to store his trust account records, i.e. in so many places that no one, including himself, can expeditiously track and retrieve them, appear calculated to thwart the Bar and this court in their ability to exercise oversight of respondent's use of his law office trust account. Braswell remained combative throughout these proceedings when asked to explain or document receipts and expenditures from his trust account. He never acknowledged the seriousness of his record-keeping deficiencies nor expressed the slightest contrition for them. In this court's view, Braswell has ill served his clients and his profession by mishandling funds his clients have entrusted to his professional care.

## VIII

### BRASWELL'S LACK OF COOPERATION IN THE DISCIPLINARY PROCESS CONSTITUTES MULTIPLE VIOLATIONS OF RGDP RULE 5.2 AND ALSO VIOLATES ORPC RULES 8.1(B) AND 8.4(C)

¶ 80 The procedural history of this disciplinary proceeding is extraordinary. The de-

---

**101.** The inadequacy of another of respondent's office procedures was dealt with by this court in an earlier disciplinary proceeding. *State ex rel.*

*Okl. Bar Ass'n v. Braswell,* 1983 OK 63, 663 P.2d 1228.

gree of Braswell's defiance of legitimate Bar requests, as well as of those by the trial panel, for information and documents is unprecedented. His testimony at the many depositions to which he had to be subpoenaed was often incoherent, self-contradictory, unresponsive, and contentious. To the extent possible within the limitations of this format, we set out the evidence which, as much as the substantive violations of professional ethics established by the Bar, convinces us to adopt the PRT's recommendation of discipline to be imposed in this case.[102]

¶ 81 Contact between the Bar and respondent with respect to the Bowen grievance began with the Bar's letter of August 24, 1994, informing Braswell that Louise Bowen had filed a grievance against him and providing him with the text of Rule 5.2 of the RGDP, which requires a lawyer against whom a grievance has been filed to make a written response to the grievance.[103] Braswell responded by letter dated September 16, 1994, requesting until October 30, 1994, to respond to the grievance, citing his workload and stating that "this case is up on appeal at present." The Bar granted Braswell this extension. On October 31, 1994, one day after the extended deadline for responding to Bowen's grievance had expired, Braswell wrote to the Bar requesting another extension of time in which to respond. The Bar decided that a second extension of time was inappropriate, denied Braswell's request, and insisted upon an immediate response. As of the 10th day of November, 1994, Braswell had still not provided a written response to Bowen's grievance, and the Bar applied for a subpoena to compel Braswell to appear and testify about the matters contained in Bowen's grievance.

¶ 82 Only after the issuance of the subpoena, approximately three and one-half months after the Bar first notified him that a grievance had been filed, did Braswell finally provide a written response to the Bar on Bowen's grievance.[104] Amazingly, his nearly two-page "response" never addressed his failure to give Bowen her $8,000. The explanation for this came in Braswell's testimony at his first deposition on December 8, 1994, when he stated that he had not actually read Bowen's grievance prior to submitting his "response." [105] In his PRT testimony on January 17, 1996, Braswell stated that he had read the Bar's letter when it arrived, but could not read Bowen's handwritten complaint. He had to have someone read a portion of it to him later.[106] Still, he was unable to say when that took place, whether before or after he responded to the grievance, whether before or after he was deposed in December 1994, or whether all or only a

---

102. To avoid interrupting the flow of the text, some of the testimony will appear in footnotes.

103. *RGDP, supra,* note 3, Rule 5.2, which provides in pertinent part:

"... serve a copy of the grievance ... upon the lawyer, who shall thereafter make a written response which contains a full and fair disclosure of all the facts and circumstances pertaining to the respondent lawyer's alleged misconduct unless the respondent's refusal to do so is predicated upon expressed constitutional grounds.... The failure of a lawyer to answer within twenty (20) days after service of the grievance ..., or such further time as may be granted by the General Counsel, shall be grounds for discipline."

104. Transcript, PRT Hearing, January 17, 1996, at 172:

"Q. Will you look at Complainant's Exhibit Number 20, please?
A. What is that document?
Q. That is the subpoena—for the application for subpoena. Have you had a chance to review that with Mr. Southern?
A. Yes, sir.
Q. You didn't respond in writing until after you were served with a subpoena to come to the bar association and testify, did you?
A. I don't know. Whatever dates are on them, they speak for themselves."

105. *Transcript, Deposition, December 8, 1994, supra,* note 73, at 6–7:

"Q. Now, she sent the Bar Association a letter, which was received by the Bar on July 1, 1994. We sent that to you in a letter, August 24th, 1994. Did you receive your copy of her original grievance?
A. I received a copy of it. I have not read it, but I have received it.
Q. You did not read it when you got it?
A. No.
Q. So you are unaware then of what the allegations are that Ms. Bowen says that you have done that she objects to?
A. That is correct. I have not gone in to read the grievance, itself."

106. Transcript, PRT Hearing, January 17, 1996, at 97.

portion of the grievance was read to him.[107] When asked how he could respond to Bowen's complaint if he had not had the whole thing read to him, Braswell responded, "It's simple. You respond to what parts you know about." [108]

¶ 83 The subject came up again later the same day, and Braswell's testimony became self-contradictory; in one response he stated that he had definitely read a portion of the grievance prior to responding to it, and in another that he had no argument with his prior testimony at the December 8, 1994, deposition to the effect that he had not read the grievance. He reconciled this testimony by claiming that when he said he had not read the grievance, he only meant that his visual impairment prevented him from physically reading it himself, but his answer did not mean that someone else had not read it to him.[109]

¶ 84 In addition to failing to read all or part of the grievance before responding to it, Braswell also failed to read the subpoena ordering him to appear at the first deposition.[110] Testimony at the PRT hearing on this issue occupies approximately nine pages of convoluted, argumentative, and self-contradictory testimony,[111] culminating in the following exchange:

"Q. Mr. Braswell, let me clear this up: Did you or did you not read the subpoena before you came to the deposition?

A. I don't really know whether I read it or I didn't read it. My testimony was

that I didn't read it before and I did not read it." [112]

¶ 85 In reviewing the history of the investigation of this grievance, we are struck by respondent's disregard for his professional duty to cooperate in the investigation. He gave the lowest priority to his duty to provide a written response to the Bar. His initial requests for extensions, innocent standing alone, can only be seen as a delaying tactic when viewed in the context of his subsequent conduct and testimony. The gravamen of Bowen's grievance was simple and required only a simple response if in fact Braswell had her money waiting for her as he testified he did. But even when a response was submitted, it failed to deal with the issue under review *because Braswell had not read the grievance,* either at all or at least adequately to frame a competent answer. *Nor had he bothered to read the subpoena* requiring him to testify and to bring records responsive to Bowen's grievance. While respondent was refusing to exert the slightest effort to resolve the matter, lawyers for the Bar and members of the PRT were required to expend valuable time and resources simply trying to get a reasonable response from him. It is difficult to conceive of conduct more indicative of disdain for the duty of a lawyer to assist in the self-regulatory disciplinary system of our profession.

¶ 86 Braswell demonstrated a similar pattern of disregard for the investigatory process in relation to the inquiry into Judge Russell's grievance. In response to the Bar's

107. *Id.* at 96–101.

108. *Id.* at 102.

109. *Id.* at 194–195. Respondent's visual impairment is not an excuse for unprofessional conduct and poses no legal impediment to imposition of discipline. *State ex rel. Okl. Bar Ass'n v. Busch,* 1996 OK 38, 919 P.2d 1114.

110. *Transcript, Deposition, December 8, 1994, supra,* note 73. The first series of questions and responses is found at page 5, the second at page 31–32.

1. "Q. Mr. Braswell, you understand that you are here in response to a subpoena duces tecum that was served upon you by the Bar Association; are you aware of that?
A. Yes.

Q. In that subpoena, you were directed to bring with you books, records, papers and documents, and all bank records and other tangible evidence concerning the grievance filed by Louise Bowen; are you aware of that?
A. No. No, I haven't—it was just a subpoena. I didn't worry about reading it. I knew I had to be here, and I had run all the copies of the entire file. But that was it."
2. "Q. Okay. You understand, again, the subpoena directed that you bring those with you, and you—
A. I did not read that document.... I didn't worry about reading it. I still don't know exactly what was on the thing...."

111. Transcript, PRT Hearing, January 17, 1996, at 196–204.

112. *Id.* at 204.

initial letter to him, Braswell did *not* provide a written response to the Bar concerning Judge Russell's grievance. After thirty-five days had gone by, the Bar sent him a letter by certified mail demanding a response and informing him that failure to contact the Bar within five days would result in the immediate issuance of a subpoena. At this point, Braswell finally responded. In a rambling four-page "response," Braswell *reduced Judge Russell's letter to a racially motivated attack* against him. He dismissed the charge of perjury in a single sentence and failed to address the falsification of loan documents, except to emphatically state that he would not under any circumstances permit the Bar to review any of his personal assets. He was equally unresponsive to the Bar's subsequent attempt to elicit from him a written response.[113]

¶ 87 Having received no adequate written response, the Bar was forced to issue a subpoena to compel Braswell's testimony. Braswell's response to the subpoena is indicative of the dilatory tactics he employed throughout this proceeding. The subpoena identified the Russell grievance by its Disciplinary Case Number, the same number which had appeared on all previous Bar correspondence concerning this grievance and the same number that Braswell had himself utilized as a reference in his own correspondence to the Bar. Despite this, Braswell sent a letter to the Bar asking the Bar to identify the grievance covered by the subpoena. His explanation of this request for information fails to convince us that it was other than a crude delaying tactic.[114]

¶ 88 Also after receiving the subpoena, Braswell sent the Bar copies of two IRS documents entitled Notice of Seizure and two entitled Release of Levy. In an accompanying letter, he stated that in his opinion his original response had been complete and that a request by the Bar for additional information would have to be "identified in detail." These items were clearly not responsive to all of the concerns expressed in Judge Russell's grievance letter, and were a patent and flagrant misreading of the Bar's post-grievance letter asking Braswell to provide a detailed response to all the potential violations.[115]

¶ 89 The deposition, covering the Russell, Bowen, and Dixon grievances, did not take place on the scheduled day.[116] Braswell testified at the PRT hearing that he could not remember why it had to be reset. When he did eventually appear for a deposition in this matter, the record indicates that his appear-

---

113. On January 13, 1995, the Bar sent Braswell another letter pointing out that his "response" had failed to address his sworn testimony about his assets and the bank loan application. The letter specified that the testimony in question concerned property listed as assets on the bank application which had been seized by the IRS. The letter asked for records and for a detailed response to the matters contained in Judge Russell's letter. Braswell was given ten days in which to respond.

114. Transcript, PRT Hearing, August 22, 1996, at 368. The record contains two full pages of questions and answers regarding Braswell's letter to the Bar asking for the identity of the grievance referenced by the subpoena. Bar Counsel wanted to know why Braswell, an experienced attorney, had sent a letter to the Bar asking the identity of the grievance referenced by the subpoena while in that same letter citing the subject grievance by its Disciplinary Number. Braswell's explanation was that he had looked only at the body of the subpoena, the body of the subpoena did not reveal the identity of the grievance and, therefore, he was merely asking for clarification. Coming from someone who had already referenced the grievance in a previous correspondence, this explanation is unconvincing.

115. PRT Hearing, August 22, 1996, Complainant's Exhibit 41, Letter of Oklahoma Bar Association to Michael Braswell, dated January 13, 1995. At the PRT Hearing, Braswell was asked whether he believed that his letter of February 6, 1995 and its accompanying documentation (the copies of the IRS Notices of Seizure and Releases of Levy) had been responsive to Judge Russell's grievance letter. Braswell's response was that his February 6, 1995 letter "was not in response to that." He narrowly construed the Bar's letter to be asking only for the specific documentation relating to the bank transactions, when in fact the letter clearly stated, "We will need you to provide records on these matters *and respond in detail to the specific items addressed by Judge Russell.*"

116. Although it cannot be considered as evidence, a question put to Braswell regarding the reason for the postponement of the deposition suggests that it was Braswell's tardiness in appearing at the scheduled time which resulted in the court reporter's departure.

ance again had to be compelled by another subpoena.[117] Questioned about this, Braswell denied knowing whether he had to be subpoenaed for this deposition a second time. He could offer no reasonable explanation as to why he had to be subpoenaed twice before the Bar could question him.[118]

¶ 90 In summary, it took Braswell approximately forty days to provide his first written response to the Bar regarding Judge Russell's grievance. This response, like that in the Bowen matter, failed fully and fairly to disclose the information necessary for the Bar properly to investigate the grievance. In addition, he had to be subpoenaed twice before the Bar was able to obtain information from him that should have been forthcoming voluntarily. The entire tenor of his conduct in the investigation of this grievance was one of disregard for his professional obligation to cooperate with the Bar in resolving accusations of misconduct.

¶ 91 Respondent displayed the same pattern of noncooperation with the Bar investigatory process in responding to the Dixon grievance. For nine months, the Bar received no substantive response to the Dixon grievance. Braswell's initial response was limited to a statement that he did not understand the nature of Dixon's grievance and that on all legal matters in which he represented Dixon, everything had been "complet-

ed and done timely and within the law." [119] In a subsequent letter to the Bar, Braswell again stated that he could not see how the grievance related to any legal representation he had given Dixon.[120]

¶ 92 Unable to obtain any information from Braswell about this grievance, the Bar obtained a subpoena.[121] In the nine months since the Bar had first sent Braswell notice of Dixon's grievance, it had received no substantive response from him. At the deposition, Braswell continued to maintain that he did not understand Dixon's grievance and that his legal representation of Dixon was unassailable.[122]

¶ 93 As Bar Counsel began to question him about specific transactions with Dixon, Braswell took the position that those transactions had not been done in his capacity as a lawyer, and that he was under no obligation to answer any questions relating to his business relationship with Dixon.[123]

¶ 94 As a result of Braswell's refusal to testify, the Bar had to obtain authority to compel Braswell's testimony concerning the Dixon grievance. Having done so, the Bar again deposed Braswell on the Dixon grievance.[124] Another eight months had gone by. *In total it had taken the Bar seventeen months and two subpoenas to obtain any*

---

117. Transcript, PRT Hearing, August 22, 1996, at 369.

118. *Id.* When asked why he had not just responded without having to be subpoenaed, he answered somewhat incoherently, "Counsel, I responded to what I had given the situation that was presented to me."

119. Complainant's Exhibit 72, a letter from Braswell to the Bar dated August 2, 1994, states, "I have reviewed the documents which you provided concerning the above grievance. I am at a loss to understand what the grievance could be about. Everything that we have represented him on *in legal matters* has been completed and done timely and within the law." (emphasis added)

120. Complainant's Exhibit 73, a letter from Braswell to the Bar dated November 29, 1994, states, "It is impossible for me to provide any further response because I do not know what the grievance is and how it relates to any representation I have provided to him."

121. This is the same subpoena that covered the Russell and Bowen grievances.

122. *Transcript, Deposition, April 12, 1995, supra,* note 78, at 85–86. ("Everything that I've done on a legal basis is to—I think we're current, and haven't done anything that would warrant any— ...")

123. *Id.* at 89. (Braswell testified, "And I thought I made it clear in there. As far as the Bar Association is concerned, my legal representation, I'll answer any questions in the world. I have an obligation to do that, and I think I've done a good job. Sometimes I screw up, but basically I do, normally, a good job.

But anything that has to do with that corporation is not before this Bar. It's not something that the Bar has any interest in, whatsoever.")

124. This last deposition, held on December 19, 1995, was devoted exclusively to the Dixon grievance and Braswell responded to questions concerning matters outside his law practice.

*information from Braswell about this griev-*
*ance.*

¶ 95 As uncooperative as Braswell was in the investigation of the grievances making up the four counts of the complaint, perhaps his most egregious lack of cooperation occurred in connection with the Bar's attempts to document his handling of his law office trust account. It is not an exaggeration to say that he "stonewalled" the Bar and the PRT with his resistance to providing responsive testimony or supplying requested documents both before and during the PRT hearing.

¶ 96 The trust account records tug-o'-war began at the first deposition in the Bowen matter when respondent refused to sign a release of his trust account records so that the Bar could verify his testimony. His agreement to voluntarily supply records relating to the Bowen grievance produced nothing pertinent to the gravamen of Bowen's complaint that she could not obtain from him her settlement funds.[125]

¶ 97 Unable to obtain records from Braswell voluntarily, the Bar subpoenaed his trust account records, which not only provided previously unknown information on the Bowen and Russell grievances, but also opened up the related problem of Braswell's misuse of his trust account. The revelation of a number of suspicious trust account transactions prompted the Bar and the PRT panel at various points during the investigation and hearing to request from Braswell additional records and documentation. These requests were generally met with re-

spondent's verbal assent to produce them, but the records and documentation that had been expected never came forth. He maintained throughout that he had not made any improper use of his trust account.

¶ 98 The PRT wanted documentation, for example, showing the source of the many cash deposits into Braswell's trust account. When trust account deposit tickets did not provide that information, respondent indicated that he kept a receipt book which contained notations as to the purpose for which he received and deposited cash. The PRT Master asked Braswell to call his office and have someone bring over that receipt book and any other documentation which would show the source of cash deposits he made into his trust account as well as withdrawals for 1993 and 1994. Nothing was delivered until the third day of testimony when a deposit book was produced in which all entries for cash deposits were tabbed, but none identified the source of the cash as the PRT Master had requested. Braswell now informed the panel that the information requested could only be retrieved by going through every client file.

¶ 99 The PRT's effort to obtain documentation of the purpose for which checks were written out of Braswell's trust account met with the same result. The records obtained by the Bar pursuant to subpoena covered an eighteen-month period, and showed many unexplained checks written out to Braswell himself, as well as to his family members and his construction company.[126] These checks

125. By letter dated December 12, 1994, Braswell sent to the Bar a copy of the deposit ticket showing that a little more than $35,000 had been deposited into his trust account on July 23, 1993, the day Bowen endorsed the settlement check, a copy of the check he wrote to Bowen for $7,000 on August 27, 1993, and a copy of what appears to be the back of the check with Bowen's endorsement. In an accompanying letter he indicated that these were the only records relating to the Bowen matter. The fact that these three documents provided nothing from which the Bar could ascertain what happened with respect to Bowen's money was apparently of no concern to Braswell. When asked at the PRT hearing how the Bar was supposed to determine what happened to Bowen's money by looking at the three items submitted by Braswell, he responded, "Well, Counsel, I can't tell you what they can do. I gave the records that I had." Upon further

questioning, his denial that he had other pertinent records was contradicted by his admission that he had also been in possession of the bank statements and other documents subsequently obtained by the Bar pursuant to subpoena, which provided information to the Bar relevant to Bowen's grievance.

126. Over a two month period, checks were written out of Braswell's trust account payable to Braswell Enterprises, Inc., Braswell's construction company, for almost $13,000, but Braswell was unable to identify the specific purpose of any of the checks. He said he would have to go back and check the records to find out what the payments were for. *See,* Transcript, PRT Hearing, January 17, 1996, at 234–235. The following exchange took place between the PRT Master and Braswell over these payments:

contained no notation as to the reason they had been written out of the trust account. Braswell testified that the checks came in two pieces and the notation explaining the purpose of the check was on the bottom portion. These, like the notations regarding cash deposits, were kept with each individual client file and were therefore not retrievable without a search through every client file.[127] Braswell agreed to provide the portion of the check indicating its purpose for those checks written out of his trust account payable to himself. Despite this, on the second day of testimony, Braswell brought only a sample of the checks, to show what they looked like, and on the third day he produced approximately a dozen check carbons identifying the payee of the check and the reason the check was written. None of these related to any of the checks made out to himself or to Braswell Enterprises, Inc.[128] The following exchange took place regarding Braswell's failure to provide any documentation regarding the checks made out to himself from the trust account:

"Q. Why then did you not go and pull those checks that were made out to you personally or the records on those occasions to show the trial panel what those were for?

"Ms. Feaver: And so it's your testimony that you wrote out of your trust account $6500 worth of checks, two months in a row in 1993 and you don't have any idea what they're for.

The Witness: I don't have a recollection right now exactly what is. I'd just to go back and check the records.

Ms. Feaver: What records would you check?

The Witness: I'll have to first, look at the check itself and the—bottom part and then go over and ask my brother what was going on during that time period, cross check.

Ms. Feaver: So even though you wrote the checks out of your trust account, you wouldn't have any records that indicate what you wrote the checks for.

The Witness: No, I didn't say that. I said I would have to go back and check to see exactly because normally, I put on the bottom of the check what it's for.

. . .

Ms. Feaver [referring to Complainant's Exhibits 11–A and 10–A]: And direct our attention to any of those checks written from your trust account to Braswell Enterprise, Inc. that indicate on a memo or anyplace else on the check what the check was written for.

A. I could not find the ones that were made to me.

Q. Couldn't find any of those that were made out to you?

A. There wasn't but one that I recall. I went through them and I could not find that and I went to my stack that I had for 1994.

Q. Okay, Mr. Braswell, do you want me to go back through these checking account records on Complainant's Exhibit 34 and point out the checks that were made out to you as evidenced in your exhibit prepared by me?

Checks to you on 3–28–94, 5–24–94, 6–9–94, 6–8–94, 8–4–94, 11–22–94, 12–1–94 and the $8,000 check made out 12–7–94. You couldn't find records on any of those?

A. When I went through my records, I couldn't find any. The one for the 8,000, I thought I had pulled it out and—no, I'm sorry. It wasn't—because I had an audit going on. I went through all of them and pulled out everything that was in my original stack that I—that I keep of the one that I have, so no, I did not find—" [129]

¶ 100 Reacting to Braswell's failure to turn over any documentation, the PRT, at the end of the first day's testimony, directed him to provide copies of all exhibits he in-

The Witness: I've already gone through those and you don't have the memo. You don't have those on there.

Ms. Feaver: You're not referring then to the memo on the check itself?

The Witness: No. Huh-uh. The check is two part. First is a part where you put all the information on the payee and the amount, but as the tear off part that's on the bottom, that is the memo." *Id.* at 237–238.

127. Asked whether he could have someone in his office bring over the parts of the check which he keeps and which would show for what purpose a check was written, Braswell responded that he could not do that and have it available for that day's hearing because he would "have to go back through all the records and look at every one that was written and then pull which case it goes against, pull those things out." Transcript, PRT Hearing, January 17, 1996, at 157.

128. Transcript, PRT Hearing, August 23, 1996, at 530–531.

129. *Id.*

tended to introduce at the next day's hearing to the Bar by January 24, 1995, concluding with this show of irritation,

"... that any response by the respondent at the conclusion of this hearing—at the continuation of this hearing, that he has documentation that he just needs to go look for it, that he needs to find it, that he—he knows it exists, but it's not here, are going to be disregarded and so if he has documentation in his defense on these four counts, that documentation needs to be retrieved from wherever it is and copied to Mr. Speegle by the 24th of January at 5 o'clock and there will not be any exception to that." [130]

Despite this admonishment, Braswell failed to provide the Bar with copies of the checks introduced on the third day of testimony prior to that day's hearing, resulting in a serious rebuke by the PRT Master.[131]

¶ 101 In addition to his failure to provide requested documents and records, Braswell had to be repeatedly admonished by panel members to respond to the questions asked. This occurred frequently when the question called for a yes or no response or when Braswell began to give an involved, non-responsive answer.[132] The following exchange typifies the difficulty of obtaining responsive answers from Braswell:

Q. How about the checks that you write to yourself out of your trust account? How would you classify those?

A. That would depend on what they were written for, Mr. Speegle.

Q. How would we determine that?

A. Determine at the time what the check was.

Q. Would you note that on any kind of a stub or a record anywhere what this check was for that you wrote out for yourself or the checks that you write out for yourself out of the trust account?

A. I—I would think it would. I don't know. I can't speculate. I can't speculate, Mr. Speegle.

Q. You're the only one that signs checks out of that trust account; is that right?

A. That's correct.

Q. And you keep the balance, you put in the money and you sign all the checks that go out and you don't know whether there's any notation anywhere about what these checks are for that you write yourself out of the trust account?

A. I didn't state that, Mr. Speegle.

Q. I'm—

A. My statement is—

Q. Correct me then.

A. —I do not know, try and speculate, where anything like that would be found and I can't speculate as to when I took it out and what. I can only look at the document and try to go back and see what it was written for.[133]

---

**130.** Transcript, PRT Hearing, January 17, 1996, at 257.

**131.** Transcript, PRT Hearing, August 23, 1996, at 533. This rebuke ended with a masterpiece of understatement:
"... Mr. Braswell, ... it was made abundantly clear to you when the first day of this proceeding concluded on January 17th, 1996, that you were to go through all of your records and retrieve any and all documents that you have in your possession or under your control that support your defense of these four counts and that you were to exchange copies of any exhibits that you wish to present to this panel by 5 o'clock, January 24th, and we have had other hearings in this matter on your request for a continuance where the issue of document exchange has been addressed and I—I think that your presentation of these documents today demonstrates some disregard for this process ..."

**132.** A few examples of this type of non-responsive answer and the necessity for admonishment by a panel member are found at Transcript, PRT Hearing, January 17, 1996, at 81, 84, 106–107, and 183; Transcript, PRT Hearing, August 22, 1996, at 269, 271, 272, 299, 320, and 321; and Transcript, PRT Hearing, August 23, 1996, at 553 and 580–581.

**133.** Transcript, PRT Hearing, January 17, 1996, at 154–155. In another exchange, Bar Counsel then tried to get at documentation of checks written out of Braswell's trust account through questions relating to the preparation of Braswell's tax return.
"Q. You don't show on any books anywhere where you take money out of your account and put it into your operating account and then later on, you pay yourself back out of the trust account?
A. I do it with my canceled checks. That's why I keep up with it.

¶ 102 Throughout his testimony, Braswell denied or unreasonably resisted admitting his own prior testimony or documented facts. We cite only a few instances to illustrate the difficulty of obtaining straightforward answers to even the simplest of questions. He would not acknowledge that he had refused to sign a release of his trust account records at the time of his first deposition until his deposition was read back to him, and even then his response was argumentative.[134] He insisted that by providing a copy of the settlement check, the $7,000 check to Bowen, and the back of the $7,000 check showing Bowen's endorsement, he had complied with the document request made by the Bar at the December deposition despite the fact that that deposition clearly shows that the Bar had requested the checks, the statements, and all the deposit slips from the trust account beginning on July 23, 1993.[135] He also denied that he had only provided these items after his trust account had been subpoenaed, despite the fact that his cover letter accompanying those documents is dated after the date of the December deposition. The transcripts are replete with such obstructionistic testimony, which often occupied page after page of the transcripts, to the frustration of all involved, including this court.

> Q. Okay. So you have your canceled checks at the end of the year; is that correct?
> A. I get them every month, yeah.
> Q. And you know why you took the money out; is that correct?
> A. That's correct.
> Q. You know why you wrote these checks out to yourself out of your trust account.
> A. That's right. Yeah.
> Q. But yet, you can't bring those records over here and show them to the trial panel?
> A. Wait just a minute now. You've made a statement that is not correct. No one has ever asked me that."

**134.** *Id.* at 212.

> Q. You hadn't brought those trust account records with you to the deposition as you were ordered to by the subpoena and all he was doing was asking you if you would sign a release so the Bar could get them, is that correct, and you wouldn't do it.
> A. That is not it in its totality, no. In totality again is that I gave them everything I thought he asked for from the subpoena, from what would be required at the—at the hearing, I told him that I'll provide you whatever you

¶ 103 Braswell's described conduct displays an attitude of utter disregard for the disciplinary process. RGDP Rule 5.2 states that after being served with a copy of a grievance, a lawyer shall respond with "full and fair disclosure of all the facts and circumstances pertaining to the respondent lawyer's alleged misconduct. . . ."[136] This rule also states that a failure to respond by the lawyer within the specified time shall itself be grounds for discipline.[137] Braswell violated this rule both by his lack of a timely response to the Bowen and Russell grievances and by his failure to provide a full and fair disclosure in his eventual responses to those grievances and in his response to the Dixon grievance. His untimely and non-responsive submissions, the necessity of issuing multiple subpoenas in order to obtain information from him, his appearance at a deposition without having read either the grievance or the subpoena, his unwillingness or inability to comply with reasonable requests for documents, especially those relating to his trust account, and his obstreperous manner when testifying, including the repeated necessity of admonishing him to respond to questions, convince us that Braswell engaged in a deliberate attempt to hinder, delay, and obstruct the investigation into his unprofes-

> want from what you've told me you wanted and that's it.
> Q. You would not sign a release. You refused to do that. Would you agree with me on that?
> A. That's right. I said no, I don't see any need—
> Q. Okay. And you had not brought—
> A. —of doing that.
> Q. You had not brought any of the trust account records to the deposition. Would you agree with me on that?
> A. No, I can't totally agree with you. I think—Like I said, everything that I have in my possession that I knew of at the time, I pulled out and gave to you all. Now, the trust account records, the way I perceived that was asked was whatever pertained to her as far as what had been paid to her—"

**135.** *Transcript, Deposition, December 8, 1994, supra*, note 73, at 36.

**136.** *State ex rel. Okl. Bar Ass'n v. Thompson*, 1993 OK 144, ¶ 10, 864 P.2d 339, 342.

**137.** *Id.*

sional actions. We hold that the pattern of conduct exhibited by respondent and described in this opinion violates ORPC Rule 8.1(b) which states that a lawyer in a disciplinary proceeding shall not knowingly fail to respond to a lawful demand for information from a disciplinary authority, and Rules 8.4(c) and (d), which prohibit conduct involving dishonesty, fraud, deceit or misrepresentation and conduct that is prejudicial to the administration of justice, respectively.

¶ 106 Braswell's conduct warrants discipline not for punishment's sake, but in the interest of assuring the integrity of the legal profession and to deter others from engaging in similar acts of grave misconduct. The seriousness of the derelictions, respondent's failure to assume responsibility for his wrongdoing, and our duty to protect the courts and the public from substandard legal practitioners require that respondent be disbarred.

## IX

## RESPONDENT SHOULD BE DISBARRED

¶ 104 The preamble to the ORPC states, "[a] lawyer is a representative of clients, an officer of the legal system and a public citizen having special responsibility for the quality of justice." These relationships entail responsibilities, many of which are prescribed by the Rules of Professional Conduct. A lawyer's misconduct adversely reflects on the entire legal profession, evidencing a lack of commitment to the lawyer's client and a disregard for the court's expectations and the ideals of the profession.[138] Neglect or violation of a lawyer's responsibilities compromises the independence of the profession and the public interest which that independence serves.[139]

¶ 105 The object of a disciplinary proceeding is not to punish, but to evaluate a lawyer's continued fitness to practice law in light of this court's obligation to safeguard the interest of the public, of the judiciary, and of the legal profession.[140] When a license to practice law is conferred, it is not done for the benefit of an individual, but for that of the public. So, too, with respect to this court's responsibility to discipline lawyers, we exercise that function for the welfare of the public and to ensure the proper administration of judicial or legal process.[141]

## X

## SUMMARY

¶ 107 This disciplinary proceeding yielded clear and convincing evidence that respondent committed multiple serious violations of the ORPC and the RGDP. The record is abundantly clear that respondent had little regard for the disciplinary process itself or for the resolution of the charges in dispute. The severity of the sanction for professional misconduct depends upon all the circumstances, including the wilfulness and seriousness of the violations, the respondent's willingness to acknowledge the seriousness of the wrongdoing and take responsibility for it, and the degree of cooperation demonstrated by the respondent in the investigation and resolution of the grievances. Respondent has refused to acknowledge any wrongdoing with respect to any of the grievances under review. His record of cooperation is disgraceful. Upon *de novo* review, *this court finds clear and convincing evidence that respondent is professionally unfit to practice law,* warranting his disbarment and an order for him to pay the costs of this proceeding in the sum of $5,985.08.

¶ 108 RESPONDENT IS DISBARRED AND ORDERED TO PAY THE COSTS OF THIS PROCEEDING, WHICH SHALL BE DUE WHEN THIS OPINION BECOMES FINAL.

138. *Leigh, supra,* note 9 at ¶ 14, at 667.

139. *ORPC, supra,* note 2, Preamble.

140. *Bolton, supra,* note 9 at ¶ 12, at 602; *Donnelly, supra,* note 9 at ¶ 14, at 546; *Colston, supra,* note 8 at ¶ 20, at 925: *State ex rel. Okl. Bar Ass'n v. Moss,* 1983 OK 104, ¶ 12, 682 P.2d 205, 207.

141. *Smith, supra,* note 52 at ¶ 21, at 1018; *State ex rel. Okl. Bar Ass'n v. Lowe,* 1982 OK 20, ¶ 19, 640 P.2d 1361, 1362.

¶ 109 KAUGER, C.J., SUMMERS, V.C.J., and HODGES, LAVENDER, SIMMS, HARGRAVE, OPALA, and WILSON, JJ., concur;

¶ 110 WATT, J., concurs in result.

