OSCN Found Document:STATE OF OKLAHOMA ex rel. OBA v. SHIELDS

 

 
 

 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 STATE OF OKLAHOMA ex rel. OBA v. SHIELDS
2025 OK 20
Case Number: SCBD-7480
Decided: 03/25/2025
SUPREME COURT OF OKLAHOMA
Cite as: 2025 OK 20, __ P.3d __

 
NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

 

STATE OF OKLAHOMA, ex rel., OKLAHOMA BAR ASSOCIATION, Complainant,
v.
ISAAC SETH BRANTLEY SHIELDS, Respondent.

ORIGINAL PROCEEDING FOR ATTORNEY DISCIPLINE

¶0 The Oklahoma Bar Association, Complainant, filed a complaint against Isaac Seth Brantley Shields, Respondent, alleging two counts of misconduct based on Respondent observing jury deliberations. Upon de novo review, we find Respondent violated title 21, section 588 of the Oklahoma Statutes and committed (1) a criminal act that reflects adversely on the lawyer's trustworthiness, (2) conduct involving deceit or misrepresentation, (3) conduct prejudicial to the administration of justice, and (4) actions contrary to prescribed standards of conduct for a lawyer which brought discredit upon the legal profession.

RESPONDENT IS SUSPENDED FOR SIX MONTHS;
AMENDED APPLICATION TO ASSESS COSTS GRANTED.

Gina L. Hendryx, General Counsel, Oklahoma Bar Association, Oklahoma City, Oklahoma, for Complainant.

Sheila J. Naifeh, Tulsa, Oklahoma, for Respondent Isaac Seth Brantley Shields.

OPINION

DARBY, J.:

¶1 The Oklahoma Bar Association (Bar) initiated this disciplinary proceeding on May 11, 2023, by filing a complaint against Respondent pursuant to Rule 6 of the Rules Governing Disciplinary Proceedings (RGDP), 5 O.S.2011, ch.1, app. 1-A. The complaint alleged violations of RGDP 1.3 (conduct bringing discredit upon the legal profession) and Oklahoma Rules of Professional Conduct (ORPC) 8.4(b) (criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer), 8.4(c) (conduct involving dishonesty, fraud, deceit, or misrepresentation), and 8.4 (d) (conduct prejudicial to the administration of justice), 5 O.S.2011, ch. 1, app. 3-A. The Professional Responsibility Tribunal (Trial Panel) found clear and convincing evidence establishing that Respondent violated RGDP 1.3, ORPC 8.4(d), and title 21, section 588 of the Oklahoma Statutes. The Trial Panel recommended public censure and assessment of costs as the appropriate discipline. The Bar maintains that Respondent violated RGDP 1.3 and ORPC 8.4(b),(c), and (d), and asks this Court to assess costs and impose appropriate discipline, which it asserts could range from public censure to a six-month suspension.

¶2 The questions before this Court are (1) whether Respondent violated the ORPC and RGDP, and (2) if so, what discipline should be imposed. We find that Respondent violated numerous rules governing attorney conduct. Due to the serious nature of Respondent's actions, we determine the proper discipline is suspension for six months.

I. FACTS AND PROCEDURAL HISTORY

¶3 In June 2022, Respondent was an Assistant District Attorney and Chief of Criminal for Prosecutorial District 12, consisting of Craig, Mayes, and Rogers Counties. Respondent was responsible for overseeing all criminal assistant district attorneys and made sure all criminal dockets were covered in the three-county district. Respondent mentored and trained the younger prosecutors in the office and was the primary trial attorney on significant cases.

¶4 As a result, Respondent was the lead prosecutor in the first-degree murder trial of State of Oklahoma v. Robert Kent Kraft, CF-2018-0465. The Kraft jury trial began on June 27, 2022. Jury deliberations began at approximately 3:00 p.m. on Friday, July 1, 2022.

¶5 As a carryover of COVID-safety protocols, the district court judge, Judge Pazzo, had the jury conduct deliberations in an adjacent courtroom on the fourth floor rather than the smaller, confined jury-deliberation room. The courtroom where the jury deliberated was equipped with three security cameras which were not turned off. One camera showed 95% of the courtroom.

¶6 The video feed from the courtroom cameras could be monitored from a locked security office on the first floor in the building, with no audio available. The video feed was transmitted to a large monitor and people with access to the room could switch between cameras and zoom in and out. The video quality of the cameras was almost high definition, such that facial expressions and hand gestures were visible on screen, but if one attempted to zoom in close enough to try to read words on a paper the image would become pixilated and illegible.

¶7 At approximately 5:00 p.m., an officer allowed Respondent into the security office where the video feed was playing. Respondent alleged that the security team requested his presence in the office to help resolve an ongoing security situation. Tr. Vol. II 516:3--11. All of the members of the security team who testified denied requesting Respondent's assistance with a security issue and also agreed that the specific security incident Respondent mentioned actually happened several hours later. The officer who allowed Respondent to enter the room could not recall why he did so, but testified that he knew he did not allow Respondent in due to the later security problem because he received a call asking how to handle the security issue after he was home. Tr. Vol. I 181:10--21; 183:11--19. Respondent testified that "[w]hatever little security issue that was there, I mean, within a second or two, that had been resolved." Tr. Vol. II 519:14--16. After Respondent entered the security room he did not immediately leave. Instead, according to his testimony, he stayed because of curiosity about what was taking the jury so long and because he had nothing else to do while awaiting the outcome. Id., at 519:12--13, 519:21--23, 523:15--16, 570:23--571:4.

¶8 Over the next several hours, Respondent left the security room and returned numerous times. Out of security footage covering 168 minutes, Respondent was in the security room for approximately 132 minutes while the jury deliberated. Respondent left repeatedly to smoke, to eat food that his fiancee had brought to the courthouse, and when the jury had questions. After Respondent had been in the security office for some time, he called his second chair, Assistant District Attorney George Gibbs, and instructed him to come to the security office.

¶9 While Respondent was in the security office, he watched the jurors deliberate, he manipulated the cameras to zoom in and out, and he discussed with his second chair and the security officers his observations and conclusions based upon what he could see of the jury. At one point, the jury submitted the question, "Does a hung jury give the chance for the State to retry?" to which the judge responded "You have all of the information that you need." Comp. Ex. 19. At the time the jury submitted the question, Respondent believed the jury was split 11 to 1 from his observations. When Respondent observed the jury submit the question on the video, Respondent immediately left to go to the courtroom for the presentation of the question. Respondent did not disclose to the judge or opposing counsel that he had been observing the jury, or that he had an idea of what the actual vote might be at that moment. When asked why he did not inform the judge at that time that he had been watching the jury deliberate, Respondent testified:

Quite frankly, when we went up to - - I mean, that jury note process was so quick and so fast, and it was, "Hey, got a note, hung jury. Should I just go with the standard reply?" Me and [Defense Counsel] both look at each other and go, "Sure." And then that's what he did and we broke contact. I mean, Judge Pazzo and I - - I didn't think to do it. I should have, but I didn't, but it wasn't some intentional, hey, let's not tell the judge. Again, kind of at that time, I just felt like the trial was over and we're all just kind of waiting in our own respective manners in which it weighed.[sic]

Tr. Vol. II. 598:20--599:6.

¶10 Over the course of the evening, Respondent received several text messages from District Attorney Matthew Ballard and First Assistant Joy Thorp. At approximately 6:30 p.m. DA Ballard texted with Respondent and ADA Gibbs:

DA Ballard: So I heard you got some question about transcripts or something. Any other indication what the jury is thinking?

ADA Gibbs: I think we got a holdout[.]

DA Ballard: Ugh. The other jurors need to wear them down.

Respondent: We got a live one[.]

Comp. Ex. 12. At no time did Respondent disclose to either DA Ballard or First Assistant Thorp that he and ADA Gibbs were actually observing the jury via the video feed in the security office.

¶11 Later, Respondent texted ADA Gibbs and said "Getting there. They are doing a lot of murder stabbing re-enactments and no kung fu." Comp. Ex. 13. Near the end of the evening, Respondent texted ADA Gibbs: "I think they hit G. Come down to security." Id. Respondent testified that when he sent that text he meant that he believed the jury had reached a guilty verdict. Tr. Vol. II 574:6--9. At 7:51 p.m., Respondent requested that someone let ADA Gibbs into the security office. While observing the jury, Respondent and ADA Gibbs saw the jury submit what appeared to be the final verdict. Without receiving any notification from the court of a verdict, both Respondent and ADA Gibbs returned to the courtroom. Tr. Vol. I 212:9--21.

¶12 The jury found Kraft guilty of First-Degree Murder, Deliberate Intent, and fixed punishment at life in prison with the possibility of parole. The judge set formal sentencing for approximately 6 weeks later.

¶13 Immediately after returning to the security office after escorting the defendant, Deputy Morgan contacted his supervisor and reported his concerns about the prosecuting attorneys observing jury deliberations in the security room. Id., at 214:4--215:11. The following Wednesday, July 6, Deputy Morgan attempted to speak to Judge Russell, District Judge for Rogers County, who was not in that day. Id., at 215:22--23. The next day, Deputy Morgan spoke to Judge Russell about his concerns and Judge Russell told Deputy Morgan that he needed to inform Judge Pazzo immediately. Id., at 215:23--216:9. Judges Russell and Pazzo then contacted DA Ballard and First Assistant Thorp and made them aware of the allegations. DA Ballard and First Assistant Thorp immediately took steps to begin an internal investigation and preserve any related video. Id., at 320:2--3.

¶14 On Monday, July 11, 2022, when Respondent first returned to the office after a previously-planned trip, DA Ballard, First Assistant Thorp, and the Rogers County investigator met with Respondent and ADA Gibbs separately. Respondent admitted that he watched the jury but stated that he didn't see any problem with it. After being shown a copy of title 21, section 588, Respondent claimed that an officer requested his presence in the room with respect to a security problem with the defendant's family trying to get into the courtroom. Respondent stated he was in the security room for "30 minutes. Maybe a little more, maybe a little less." Tr. Vol. I 153:5--6, 168:7--8, 245:17--25; Tr. Vol. II. 579:12--15. He also made statements that it was difficult to see what was going on because the video was very grainy, and that attorneys and judges listen to juries in Tulsa County. Tr. Vol. I 325:17--326:9; Tr. Vol. II 591:6--593:17. DA Ballard, First Assistant Thorp, and the investigator all testified that they were concerned by Respondent minimizing the time he observed the jury. Tr. Vol. I 153:1--8, 246:2--10, 326:21--23. DA Ballard and First Assistant Thorp both testified that after learning the results of the investigation they believed that Respondent fabricated the excuse to enter the security room to watch the jury footage as the altercation he mentioned happened much later that evening. Id., at 151:23--152:25, 324:23--325:16. Finally, the Sergeant in charge of courthouse security and the Rogers County investigator testified that Respondent's comments about the quality of the video were absolutely not the case and the video was remarkably clear. Id., at 245:25--246:2, 328:15--17; see also id., at 177:6--8. At the end of the interview, DA Ballard informed Respondent that he was suspended with pay.

¶15 On July 12, 2022, after confirming that both Respondent and ADA Gibbs had observed the jury in potential violation of title 21, section 588, DA Ballard sent the Attorney General an official request for disqualification of his office, District 12, in the upcoming investigation. Comp. Ex. 5. The following day, Respondent self-reported the matter to the Bar. Comp. Ex. 5. Judge Pazzo and First Assistant Thorp both reported the matter to the Bar as well. DA Ballard subsequently gave Respondent the option of resigning or being terminated from his position and Respondent chose to resign as ADA and Chief of the Criminal Division in Rogers County. Tr. Vol. I 330:1--6. On March 1, 2023, Respondent entered into and agreed to the provisions of an Agreement of Deferred Prosecution wherein Respondent acknowledged that he violated title 21, section 588. 

¶16 On May 11, 2023, the Bar filed its complaint against Respondent alleging in Count I that Respondent violated RGDP 1.3Kraft jury deliberations. In Count II the Bar alleged that Respondent violated RGDP 1.3 and ORPC 8.4(b) Id. Respondent further claimed that he understood "that you could not disturb a jury's deliberations, as he ha[d] watched prosecutors, defense attorneys, court staff, and judges listen to juries when deliberations would get loud. It was a common occurrence." Id. In response to count II, Respondent denied violating the statute and denied that he admitted so in the Agreement of Deferred Prosecution, instead citing to the portion of the Agreement which stated he had no intent to break the law.

¶17 The Bar requested that this Court join Respondent and ADA Gibbs's cases for purposes of the trial panel hearing because they involved similar, if not identical allegations and evidence. We granted the motion and ordered the Bar to file a joint record of the hearing in this case, but for the Trial Panel to provide a separate Report and Recommendation in each case.

¶18 The Trial Panel held the hearing on August 17-18 and September 8, 2023. Kraft's defense counsel testified before the Trial Panel that he had requested a mistrial for his client based on Respondent's and ADA Gibbs's actions. The district court sustained the motion for mistrial based on Respondent's and ADA Gibbs's conduct. 

¶19 The Bar initially requested a six month suspension, but emailed the Trial Panel a revised recommendation of a range of public censure to six months suspension based on case law. 

II. STANDARD OF REVIEW

¶20 The Supreme Court of Oklahoma possesses original, exclusive, and nondelegable jurisdiction to control and regulate the practice of law, licensing, ethics, and discipline of attorneys. State ex rel. Okla. Bar Ass'n v. Braswell, 1998 OK 49975 P.2d 401see also 5 O.S.2011, § 13State ex rel. Okla. Bar Ass'n v. Godlove, 2013 OK 38318 P.3d 1086 see also RGDP 6.12. Clear and convincing evidence is evidence sufficient, both in quality and quantity, to produce a firm conviction of the truth of the allegations. Godlove, 2013 OK 38 see also RGDP 6.12.

¶21 The Court reviews the Trial Panel proceeding de novo in order to determine whether discipline is warranted and what sanction, if any, should be imposed. State ex rel. Okla. Bar Ass'n v. Bednar, 2019 OK 12441 P.3d 91 State ex rel. Okla. Bar Ass'n v. Schraeder, 2002 OK 5151 P.3d 570

III. ANALYSIS

¶22 The Bar alleged that Respondent violated RGDP 1.3 and ORPC 8.4(b), 8.4(c), and 8.4(d), as well as title 21, section 588. We have reviewed the evidence and find that all of the Bar's allegations are supported by clear and convincing evidence. We disagree with the Trial Panel regarding the recommended discipline.

¶23 In his Brief in Chief, Respondent admits that "his watching a jury deliberate violates ORPC 8.4(b) and (d) but [asserts he] did not violate Rule 8.4(c) . . . ." Br. in Chief at 4. Because any discipline is dependent upon Respondent's actions, we briefly address each violation on a rule-by-rule basis. We start with the statute that Respondent violated: title 21, section 588. It states:

If any person, firm or corporation shall knowingly and willfully, by means of any device whatsoever, records or attempts to record the proceedings of any grand or petit jury in any court of the State of Oklahoma while such jury is deliberating or voting or listens to or observes, or attempts to listen to or observe, the proceedings of any grand or petit jury of which he is not a member in any court of the State of Oklahoma while such jury is deliberating or voting shall be guilty of a felony and shall be fined not more than One Thousand Dollars ($1,000.00) or imprisoned not more than two (2) years, or both. Provided, however, that nothing in this section shall be construed to prohibit the taking of notes by a grand juror in any court of the State of Oklahoma in connection with and solely for the purpose of assisting him in the performance of his duties as such juror.

21 O.S.2011, § 588See 1957 Okla. Sess. Laws 160; see also 1997 Okla. Sess. Laws 681, 1999 Okla. Sess. Laws 2399. The statute does not require intent to interfere with the jury in order to be guilty of a felony. Nor does it require knowledge of the statute. Simply knowingly observing jury deliberations is enough.

¶24 Although Respondent signed a Deferred Prosecution Agreement acknowledging that he violated section 588, he continued to deny doing so due to his lack of intent to violate the law. See Complainant's Ex. 17 at 2, para. 7; see also Answer at 2, para. 10. Respondent also asserted that he believes others commonly listen to juries deliberate, therefore justifying his actions. See Answer at 2, para. 8. While most of the attorneys who testified before the Trial Panel were unaware that observing a jury is a felony offense, they all agreed that it is something that is strictly forbidden -- describing it as wrong, unethical, improper, unfair to the defendant and process overall, and an invasion of the sanctity of the jury. The evidence that Respondent knowingly and willfully observed the Kraft jury deliberations and thus violated title 21, section 588 is clear and convincing.

¶25 Oklahoma Rules of Professional Conduct 8.4(b) states "[i]t is professional misconduct for a lawyer to: . . . commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects . . . ." ORPC 8.4(b), 5 O.S.2011, ch.1, app. 3-A. As stated above, there is sufficient evidence that Respondent committed a criminal act, thus the question is whether his criminal act is one which reflects upon his honesty and trustworthiness as a lawyer. Comment 2 to ORPC 8.4 clarifies:

Many kinds of illegal conduct reflect adversely on fitness to practice law, such as offenses involving fraud and the offense of willful failure to file an income tax return. However, some kinds of offense carry no such implication. Traditionally, the distinction was drawn in terms of offenses involving "moral turpitude." That concept can be construed to include offenses concerning some matters of personal morality, such as adultery and comparable offenses, that have no specific connection to fitness for the practice of law. Although a lawyer is personally answerable to the entire criminal law, a lawyer should be professionally answerable only for offenses that indicate lack of those characteristics relevant to law practice. Offenses involving violence, dishonesty, breach of trust, or serious interference with the administration of justice are in that category. A pattern of repeated offenses, even ones of minor significance when considered separately, can indicate indifference to legal obligation.

ORPC 8.4 Cmt. 2. Respondent's violation of the inner sanctum of a jury is a high breach of trust and a serious interference with the administration of justice. We find clear and convincing evidence that Respondent committed a criminal act that reflects adversely on his honesty and trustworthiness as a lawyer in violation of ORPC 8.4(b).

¶26 Oklahoma Rules of Professional Conduct 8.4(c) states "[i]t is professional misconduct for a lawyer to: . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation . . . ." ORPC 8.4(c), 5 O.S.2011, ch.1, app. 3-A. Black's Law Dictionary defines deceit, in part, as "[t]he act of intentionally giving a false impression." Black's Law Dictionary 413 (7th ed. 1999). Misrepresentation is defined, in part, as "[t]he act of making a false or misleading statement about something, usu. with the intent to deceive. . . . . 'Concealment or even non-disclosure may have the effect of a misrepresentation.'" Black's Law Dictionary 1016 (7th ed. 1999)(quoting Restatement 2d of Contracts § 159 cmt. a (1981)). We have previously held that in order to find a violation under RGDP 8.4(c), "[a] misrepresentation must be shown by clear and convincing evidence that the declarant had an underlying motive (i.e., bad or evil intent) for making the statement." State ex rel. Okla. Bar Ass'n v. Taylor, 2003 OK 5671 P.3d 18 State ex rel. Okla. Bar Ass'n v. Johnston, 1993 OK 91863 P.2d 1136State ex rel. Okla. Bar Ass'n v. Besly, 2006 OK 18136 P.3d 590

¶27 Respondent not only observed the jury for over two hours, he failed to disclose that he was doing so to the court, or opposing counsel, even when dealing with jury questions. This is egregious behavior. Further, when initially confronted by his supervisors after the trial, Respondent admitted that he observed the jury due to curiosity; but immediately after he was confronted with the statute that he violated, Respondent changed his reason for originally entering the security office to say he was only in the security office because he was asked to help. See Tr. Vol. II. 567:4--569:25. At that time, Respondent asserted that he was in the security room for thirty minutes, possibly slightly less or more. Yet not a single member of the security team, including the supervisor who allowed him into the room, agreed that he was ever consulted on a security issue that day. Later, Respondent stated that the incident for which he was asked to enter the office lasted only a few moments; yet, he was in the security office for approximately two and a quarter hours, continually leaving and returning. Respondent also informed his supervisors that the video feed was grainy and that he couldn't see much, when that was also false. Instead, the video was high enough quality to make out the juror's facial expressions and hand gestures. Respondent misrepresented and was deceitful regarding the reason he entered the security room, the length of time he watched the jury, and what he observed. Due to Respondent's initial admission of his behavior, followed by the excuses after he learned he had violated a felony statute, we believe Respondent had the requisite intent to deceive when making his statements to his supervisors. We find clear and convincing evidence that Respondent engaged in conduct involving deceit and misrepresentation in violation of ORPC 8.4(c).

¶28 Oklahoma Rules of Professional Conduct 8.4(d) states "[i]t is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice." ORPC 8.4(d), 5 O.S.2011, ch.1, app. 3-A. Respondent violated state law and observed jury deliberations for over two hours. Respondent failed to timely disclose his observations to the judge and opposing counsel. As a result, the district court granted a motion for mistrial in the Kraft proceedings based on Respondent's and ADA Gibb's behavior and Kraft is currently stayed pending the appeal of that ruling. Even if the Court of Criminal Appeals finds the mistrial is an abuse of discretion, sentencing has been tolled for almost two and a half years because of Respondent's actions causing delay for the defendant and the family of the murder victim. Further, there were numerous news articles about Respondent's behavior which brought discredit upon the legal profession. Respondent's actions have affected not only this case, but potentially other cases involving juries in the future. We find clear and convincing evidence that Respondent engaged in conduct prejudicial to the administration of justice.

¶29 Rules Governing Disciplinary Proceedings 1.3 states "[t]he commission by any lawyer of any act contrary to prescribed standards of conduct, whether in the course of his professional capacity, or otherwise, which act would reasonably be found to bring discredit upon the legal profession, shall be grounds for disciplinary action, whether or not the act is a felony or misdemeanor, or a crime at all. Conviction in a criminal proceeding is not a condition precedent to the imposition of discipline." RGDP 1.3, 5 O.S.2011, ch.1, app. 1-A. We find clear and convincing evidence that Respondent violated RGDP 1.3 and committed acts contrary to prescribed standards of conduct which brought discredit upon the legal profession.

IV. DISCIPLINE

¶30 The main purpose of our disciplinary authority is to safeguard the interests of the public, the courts, and the legal profession. State ex rel. Okla. Bar Ass'n v. Friesen, 2016 OK 109384 P.3d 1129 Godlove, 2013 OK 38 State ex rel. Okla. Bar Ass'n v. Combs, 2007 OK 65175 P.3d 340

A. Mitigation & Enhancement

¶31 We may consider mitigating circumstances to assess the appropriate measure of discipline. State ex rel. Okla. Bar Ass'n v. Durland, 2003 OK 3266 P.3d 429

¶32 On the other hand, Respondent failed to disclose to opposing counsel or the court that he was observing the jury. Respondent deflected from the importance of what he did, and misrepresented the reason he entered the security office, amount of time he observed the jury, and what he was able to see. Respondent failed to disclose his observations at the time to his supervisors. Respondent ordered his inexperienced subordinate, whom he was responsible for training and supervising, to come to the security office on two occasions. In his answer, filed nine months after the incident, Respondent still maintained that he had not violated the statute, even after entering into the Deferred Prosecution Agreement in which he admitted doing so. Respondent also excused his behavior by arguing that other attorneys and judges had committed similar actions without repercussions. Another defense attorney testified before the Trial Panel that he had previously confronted Respondent for eavesdropping on jury deliberations in Tulsa County in 2017 and warned Respondent that it was improper to do so; Respondent said that "the only thing that [attorney] said yesterday that was the truth was when he spelled his name" and accused the attorney of testifying only because he wants to see Respondent reprimanded. Tr. Vol. II 553:19--21, 556:18.

B. Appropriate Discipline

¶33 Appropriate discipline is that which (1) is "consistent with the discipline imposed upon other lawyers who have committed similar acts of professional misconduct and (2) avoids the vice of visiting disparate treatment of an offending lawyer." Schraeder, 2002 OK 51

¶34 This Court is only aware of one other case in Oklahoma where post-Covid, a prosecutor observed jury deliberations. McCauley v. State, 2024 OK CR 8548 P.3d 461Id., ¶ 12, 548 P.3d, at 466. In McCauley, the Court of Criminal Appeals noted that the prosecutor inadvertently watched a screen showing the jury deliberate for approximately 30 seconds; once the prosecutor realized what he was seeing, he stopped watching, he later returned to the courtroom and informed co-counsel, the court, and opposing counsel of exactly what he had seen while the jury was still deliberating. Id., ¶¶ 9-18, 548 P.3d, at 465--68. There were no questions from the jury from which the limited video insight might give an advantage to one side. Ibid. The Court of Criminal Appeals found the district court did not abuse its discretion in overruling the request for mistrial. Id., ¶ 19, 548 P.3d, at 468. This situation is very different. The attorney in McCauley watched the video feed of the jury momentarily and stopped as soon as he realized that he was watching the jury; in contrast, Respondent knowingly and willfully watched jury deliberations for over two hours and then did not disclose his actions to the court.

¶35 In State ex rel. Oklahoma Bar Association v. Haworth, 1979 OK 34593 P.2d 765 Haworth, 1979 OK 34Ibid. Haworth's crime was a misdemeanor, rather than a felony. See 21 O.S.1971, § 389 Haworth, 1979 OK 34¶ 11, 593 P.2d, at 767--68.

¶36 In State ex rel. Oklahoma Bar Association v. Jack, 2021 OK 1481 P.3d 261Jack, 2021 OK 1481 P.3d 261Jack, Respondent is here for his own active misconduct rather than failure to provide oversight to those he supervised.

¶37 In State ex rel. Oklahoma Bar Association v. Miller, 2013 OK 49309 P.3d 108 Miller, 2013 OK 49Id., ¶ 6, 309 P.3d, at 113. We found Miller was guilty of conduct that was prejudicial to the administration of justice as well as unlawful obstruction of another party's access to evidence and failure to timely disclose evidence. Id., ¶¶ 19, 25, 309 P.3d, at 115--17. This Court relied largely on the passage of time between the misconduct and the discipline case in setting the punishment at only suspension for 180 days, and explained that if the conduct were to happen at the present time the punishment would be much more severe. Id., ¶¶ 30--31, 309 P.3d, at 120.

¶38 It is common knowledge that observing jury deliberations is unacceptable. Respondent's actions were widely reported in the media, bringing discredit and shame upon the legal profession. As a result, there is sure to be a chilling effect on potential jurors whom have heard of this matter. An assistant district attorney is a minister of justice, second only to a judge. Scanland, 1970 OK 94see also ORPC 3.8, Comment 1. But instead of behaving accordingly, Respondent's actions "take us into the dark, unseen, ugly, shocking nightmare vision of a prosecutor who loves victory more than he loves justice." Miller, 2013 OK 49

V. ASSESSMENT OF COSTS

¶39 The Bar has asked this Court to assess costs in the amount of $6,104.91. RGDP 6.16 provides that where violations are proven, the costs shall be surcharged against the disciplined lawyer, unless remitted in whole or in part by the Supreme Court for good cause shown, and shall be paid within ninety days of the effective date of the opinion. Respondent did not respond to the Bar's motion to assess costs. Because we find clear and convincing evidence of Respondent's misconduct, we grant the Bar's motion and order Respondent to pay full costs.

VI. CONCLUSION

¶40 Upon de novo review, we find clear and convincing evidence of Respondent's professional misconduct. Respondent is suspended for six months. Respondent is ordered to comply with RGDP 9 and to pay costs in the amount of $6,104.91.

RESPONDENT IS SUSPENDED FOR SIX MONTHS;
AMENDED APPLICATION TO ASSESS COSTS GRANTED.

Rowe, C.J., Kuehn, V.C.J., Winchester, Edmondson, Combs, Gurich, and Darby, JJ., concurring;
Kane, J., not participating.

FOOTNOTES

Preliminary hearing and jury trial having already been waived herein, the Accused acknowledges he violated 

Complainant's Ex. 17 at 2, para. 7 (emphasis added).

If any person, firm or corporation shall knowingly and willfully, by means of any device whatsoever, records or attempts to record the proceedings of any grand or petit jury in any court of the State of Oklahoma while such jury is deliberating or voting or listens to or observes, or attempts to listen to or observe, the proceedings of any grand or petit jury of which he is not a member in any court of the State of Oklahoma while such jury is deliberating or voting shall be guilty of a felony and shall be fined not more than One Thousand Dollars ($1,000.00) or imprisoned not more than two (2) years, or both. Provided, however, that nothing in this section shall be construed to prohibit the taking of notes by a grand juror in any court of the State of Oklahoma in connection with and solely for the purpose of assisting him in the performance of his duties as such juror.

21 O.S.2011, § 588

See Complainant's Suppl. to the R. (Sept. 11, 2024); State v. Robert Kent Kraft, CF-2018-465, Order, Aug. 14, 2024 (Rogers Cty.).

See Resp'ts' J. Suppl. to the R., Ex. B (Sept. 16, 2024); State v. Robert Kent Kraft, CF-2018-465, Order Granting Stay of Proceedings Pending Outcome of Appeal, Sept. 6, 2024 (Rogers Cty.); State v. Hon. Linda Thomas, PR-2024-708 (Okla. Crim. App.).

See Complainant's Suppl. to the R. (Sept. 9, 2024) (attaching Sept. 29, 2023 email for inclusion in record).